**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Louis NAKALADSKI, a/k/a Louis Nash, Ettore Coco, a/k/a Eddie Coco, Defendants-Appellants.**

**No. 72–3441.**

United States Court of Appeals, Fifth Circuit.

July 6, 1973.

Rehearings Denied July 30 and Aug. 8, 1973.

---

2. 408 U.S. 489, 92 S.Ct. 2604.

3. State v. Duncan, 270 N.C. 241, 154 S.E. 2d 53 (1967).

4. United States v. Cates, 4 Cir., 402 F.2d 473.

Milton E. Grusmark, Miami Beach, Fla., for Louis Nakaladski.

Frank Ragano, Miami, Fla., for Eddie Coco.

Robert W. Rust, U. S. Atty., Miami, Fla., Marshall Tamor Golding, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before BELL, GOLDBERG and SIMPSON, Circuit Judges.

GOLDBERG, Circuit Judge:

Appellants, Louis Nakaladski, a/k/a Louis Nash [hereinafter "Nash"], and Ettore Coco, a/k/a Eddie Coco [hereinafter "Coco"], were convicted of violating various anti-loan sharking provisions of Title II of the Consumer Credit Protection Act, 18 U.S.C. § 891 et seq. Specifically, they were found guilty of: (1) conspiring to make and making extortionate extensions of credit in violation of 18 U.S.C. § 892;[1] (2) conspiring to participate and participating in the use of an extortionate means to collect an extension of credit in violation of 18 U.S.C. § 894;[2] and (3) obstructing

---

1. 18 U.S.C. § 891(6) defines an extortionate extension of credit as:

 "any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person."

2. 18 U.S.C. § 891(7) defines an extortionate means of collection as:

 "any means which involves the use, or an express or implicit threat of use,

commerce by extortion in violation of the anti-racketeering provisions of the Hobbs Act, 18 U.S.C. § 1951. Appellants attack their convictions on numerous grounds; however, we find that appellants received a full and fair trial and that there is ample evidence to support their convictions. We affirm.

## I. THE PROCEEDINGS BELOW

Appellants were charged in an eight-count indictment with various violations of federal laws outlawing extortionate credit practices. At the trial, the government presented evidence concerning appellants' credit loan transactions with the two victims named in the indictment, Joel Whitice and Richard Besola, in order to prove the crimes charged in the indictment. The government also introduced evidence concerning similar extortionate credit transactions appellants had with other individuals in order to establish appellants' intent and their general conspiratorial course of conduct.

Viewed in a light most favorable to the government, Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680, 704, the evidence introduced at the trial established that Coco, Nash, and one James Michael Falco [3] were in the loan sharking business together as early as 1966. During that year they began to transact some of their business in the offices of one Harvey Goodman, a mortgage and insurance broker. Goodman testified that he heard discussions concerning the making of loans and collections. When Nash or Falco arranged to make a loan in Coco's absence they would telephone Coco to obtain his approval. On one occasion, Falco objected to a loan that Nash wanted to make on the ground that there had been difficulties in collecting a previous loan from the prospective borrower, but when Coco said that Nash would be responsible for collecting the new loan, it was approved.

The interest on the loans that Falco, Nash, and Coco made was shown to be highly usurious: (1) a $3,000 loan was repayable at the rate of $1,000 a month for four months; (1) a $400 loan, with $200 interest, was repayable at the rate of $50 a week. At one point Nash offered to extend loans to any of Goodman's customers who needed money at interest rates of "up to five percent per week."

Nash used Goodman's office to telephone borrowers in order to make collections. Goodman testified that on at least one occasion Nash threatened a delinquent debtor by saying "you better have our money there at one o'clock or I'll feed you your eyeballs." In April of 1967 Nash told Goodman that he needed "another strong man to work for him for collections," and Goodman offered to get in touch with a man named Raymond Seaman, who had a reputation "as muscle": Nash hired Seaman, whom he later described as "a good man, except he had a big mouth." After Seaman was found dead in a canal as a result of an automobile accident, Nash told Goodman, in the presence of Coco and Falco that Seaman "fell in the canal—nobody cared." Goodman testified that at that time "Mr. Coco did not say anything. He just smiled."

Appellants also advanced money to an individual named Leo Henzel. When Henzel received a $1,500 loan from Nash in November 1966, he was told "[j]ust as easy as you get it, that's how easy we want it back." The terms of the loans were that he was to pay $300 per week interest until he had paid back the entire principal. This loan was finally settled eight or nine months later with a $1,800 payment, by that time Henzel had already paid $4,500 to $5,000 in interest, making his total payment on the $1,500 loan between $6,300 and $6,800. When Henzel became delinquent in his payments, Nash called him and used obscene

---

of violence or other criminal means to cause harm to the person, reputation, or property of any person."

3. James Michael Falco was indicted with appellants but is apparently a fugitive and was not tried with appellants.

language in demanding the money. On several occasions, Nash informed him that the source of the loan money was "underworld elements, Mafia, and so forth."

Nash also lent $2,000 to Martin Davidow in October, 1966, on the condition that Davidow pay $150 per week for twenty weeks. In December of 1966, Davidow borrowed another $3,000, the terms being that he was to pay $150 in interest and $150 on the principal, in addition to the $150 from the October loan, for a total payment of $450. In February 1967, Davidow borrowed another $3,000, on the same terms as his December 1966 loan, raising his total weekly payment to $750. A few months later, Davidow borrowed from Nash again, bringing his total loan to approximately $10,000 and his total weekly payments to approximately $900. In the middle of 1969, Davidow fell about $1,000 behind in payments and arranged with Nash to pay $250 per week interest and nothing on the principal. By this time he had paid approximately $15,000 in interest and still owed the full $10,000 principal. When Davidow fell behind in his payments, Nash told Davidow that he "had better pay and that he [Nash] was aware of the fact that . . . [Davidow] had a wife and children." On another occasion Nash told Davidow that when a man named "Gee-Gee" had fallen behind in his payments, Nash had sent a couple of people to "straighten Gee-Gee out" by beating him up and that "Gee-Gee was making payments now."

In June or July of 1966, Joel Whitice procured his first loan from Falco. Whitice made most of his payments to Falco, who was accompanied by Nash and Coco on a number of occasions when he came to collect from Whitice. At other times Whitice also made payments to Nash or Coco. During this time Whitice operated a retail grocery business, Food Palace, Inc., in partnership with another man, selling items manufactured in various parts of the country. His initial loan was for $10,000, which he paid back in approximately one year with weekly payments of $300. In December of 1967, Whitice borrowed another $4,000, and in June he increased his total debt to $12,000. He paid interest on these loans at the rate of $25 per $1,000 per week, and by June of 1968 his total interest payment was $300 per week. By September of 1969, Whitice had paid approximately $27,600 in interest, and still owed the full $12,000 principal.

Whitice had borrowed the money for his grocery business and he made payments from the receipts of the business. While keeping up his payments to Falco, however, he fell behind in his payments to his suppliers. In June of 1969, the major supplier filed a complaint in state court alleging defaults on securities and promissory notes and sought the appointment of a receiver to take over the operation of Whitice's business. After negotiations, a stipulation was entered into permitting Whitice to operate the business for an interim period, on the condition that all checks had to be counter-signed by an accountant representing the supplier. The stipulation also provided that no payments of preexisting claims or indebtedness were to be made during the interim period, but a specific exception was written in permitting the business to continue to make the weekly $300 payments to Falco because Whitice made it clear that he would not enter into any stipulation or agreement that did not allow him to continue making these payments. He explained that if he were forced to cut the payments off, it might result in harm to him or his family. The accountant representing the supplier recalled that Whitice stated that he was in fear of his life, and the supplier's attorney recalled Whitice saying, in effect, that if he could not make the payments he might as well jump out the window. The supplier's representatives therefore agreed to permit the payments to be made.

After the receiver took over Whitice's grocery business, Falco visited Whitice to inquire whether the latter had any property on which he could give a mortgage. Upon receiving a negative re-

sponse, Falco said that he would forget the interest if Whitice could repay the principal, whereupon he was informed that the latter had no money at all. Later, after Whitice had gone into the bail bond business, Falco asked for further payments. Around May of 1970, Falco called from New Jersey and asked that money be mailed to him, and Whitice sent a check. Still later Falco called again and told Whitice not to send any more checks, and arranged to have money picked up from time to time at Whitice's office.

Richard Besola, a general building contractor, also procured a loan from Falco. In 1967, he needed money, and one of his subcontractors, a man named Rappa, contacted Falco, from whom Besola eventually received a $3,000 check. Besola was to pay the money back within thirty or sixty days, with an additional $600 as interest. When six or seven weeks went by and Besola had not repaid the loan, Coco visited him at his job site and told him that he had "made a deal" and had "better live up to it." Besola then commenced making weekly payments of $100, initially to sub-contractor Rappa, but later, after Rappa had indicated a desire not to be bothered with the matter, Besola brought them to Coco's house. Besola made payments on a sporadic basis, and made approximately twenty four payments in all. About a year after Besola first met Coco, Coco again visited him and inquired about getting the debt "squared up." He pointed out that Besola was at that time building a house for a banker and suggested that Besola make an arrangement with the banker to get the loan paid off. Besola then procured a $1997 bank loan, which was converted into a certificate of deposit which was then issued and mailed to Falco on May 29, 1968. A $2,000 certificate of deposit that Falco had purchased on April 15, 1968 was put up as collateral for the loan, and when Besola defaulted on the loan with $300 unpaid, Falco's collateral was cashed and applied to the loan, with the remaining $1,674.27 of the collateral being returned to Falco.

Besola had become concerned when he was unable to make the lump sum repayment to Falco within the agreed upon thirty-to-sixty day period. He felt that he had to get the loan repaid "one way or another," as he had become aware "after a few weeks went by that the people I borrowed from weren't exactly bankers." He knew, for example, that Coco had once been "involved in a shooting." Besola claimed that he was not personally afraid of Coco or Falco, but he was aware of the possibility that they could send "somebody out" to "put pressure" on him. His family, moreover, was worried, and communicated their fears to him and their expressed anxieties caused him anxiety and made him desire to settle the debt as soon as possible.

After a three day jury trial, at which the jury heard and considered all of the evidence concerning the foregoing transactions, the jury found appellants guilty of: (1) obstructing commerce by extorting payments from Joel Whitice in violation of the Hobbs Act, 18 U.S.C. § 1951; (2) conspiring to make extortionate extensions of credit to Joel Whitice in violation of 18 U.S.C. § 892; (3) conspiring to use extortionate means to collect or to attempt to collect extensions of credit from Joel Whitice and Richard Besola in violation of 18 U.S.C. § 894; (4) making extortionate extensions of credit to Joel Whitice in violation of 18 U.S.C. § 892; and of (5) using extortionate means to collect or to attempt to collect extensions of credit from Joel Whitice in violation of 18 U.S.C. § 894. Coco alone was convicted of using extortionate means to collect or to attempt to collect extensions of credit from Richard Besola in violation of 18 U.S.C. § 894. Nash received concurrent sentences of ten years imprisonment on each count upon which he was convicted and was fined $5,000 on the § 1951 count. Coco received concurrent sentences of fifteen years imprisonment on each of the six

counts upon which he was convicted, and was fined $10,000 on each count for a total fine of $60,000.

In this appeal, appellants jointly attack their convictions, contending that:

(1) The District Court erred in admitting the testimony of Goodman, Henzel and Davidow.

(2) The evidence was insufficient to support appellants' convictions.

(3) The District Court erred in admitting a tape recording of a conversation appellant Coco had engaged in that was made approximately ten months after the events named in the indictment.

(4) Improper statements by witnesses prejudiced the jury and denied appellants a fair trial.

(5) The District Court erred in refusing Coco's motion for a severance.

(6) The District Court erred in refusing Coco's requests for a continuance.

(7) The grand and petit juries that indicted and convicted appellants were improperly selected.[4]

## II. THE GOODMAN-HENZEL-DAVIDOW TESTIMONY

Appellants contend that the trial judge erred in allowing the government to present the testimony of Goodman, Henzel and Davidow concerning criminal transactions that were not specifically mentioned in the indictment and that occurred during time periods not covered by the indictments on the grounds that such testimony was irrelevant and prejudicial. Although evidence of criminal conduct not charged in the indictment may not be admitted if it serves solely to show the defendant's bad character or criminal propensities, see Michelson v. United States, 1948, 335 U.S. 469, 475–476, 69 S.Ct. 213, 93 L.Ed.

168, 173–174, the testimony of Goodman, Henzel and Davidow was not admitted for that purpose. Their testimony was highly relevant, and it was admissible because it established that appellants had entered into a conspiracy to make extortionate extensions of credit and to collect payments by extortionate means as early as 1966 and that this general conspiracy was carried over into appellants' dealings with Whitice and Besola. The challenged testimony illuminated the nature of the conspiracy and established that appellants were not merely fringe associates in the conspiracy, but rather intended to participate actively in that conspiracy. Thus the Goodman-Henzel-Davidow testimony was relevant and admissible to show: (1) appellants' motive and intent in their dealings with Whitice and Besola; Matthews v. United States, 5 Cir. 1969, 407 F.2d 1371, 1381, cert. denied, 1970, 398 U.S. 968, 90 S.Ct. 2177, 2178, 26 L.Ed.2d 554; Myers v. United States, 5 Cir. 1967, 377 F.2d 412; Wilkins v. United States, 5 Cir. 1967, 376 F.2d 552, cert. denied, 1968, 389 U.S. 964, 88 S.Ct. 342, 19 L.Ed.2d 379; Weeks v. United States, 10 Cir. 1963, 313 F.2d 688, cert. denied, 1963, 373 U.S. 922, 83 S.Ct. 1523, 10 L.Ed.2d 421; Devoe v. United States, 8 Cir. 1939, 103 F.2d 584, cert. denied, 1939, 308 U.S. 571, 60 S.Ct. 84, 84 L.Ed. 479; (2) appellants' method of business, their "overall modus operandi"; United States v. Haley, 8 Cir. 1971, 452 F.2d 391, cert. denied, 1972, 405 U.S. 978, 92 S.Ct. 1205, 1206, 31 L.Ed.2d 253; (3) the existence of a general conspiracy of which the conspiratorial and substantive offenses involving Whitice and Besola were integral parts; United States v. Restrepo, 5 Cir. 1969, 417 F.2d 927; Matthews v. United States, *supra*; Collins v. United States, 10 Cir. 1967, 383 F.2d 296; Devoe v. United States, *supra*; and (4) the relation between ap-

4. Appellants have joined in each other's assignment of error. Our dispositions of their assignments jointly in no way represents a ruling on the standing of each to assert the errors relied upon by the other.

pellants and Falco; Devoe v. United States, *supra*.[5]

## III. SUFFICIENCY OF THE EVIDENCE

### A. The Section 892 Convictions

Appellants were convicted of conspiring to make and making extortionate extensions of credit to Joel Whitice in violation of 18 U.S.C. § 892. An extortionate extension of credit is one in which both the creditor and the debtor understand that default or delinquency in making payments "could result in the use of violence or other criminal means to cause harm to the person, reputation or property of any person." 18 U.S.C. § 891(6). In order to convict appellants of conspiring to make an extortionate extension of credit, it was necessary for the government to prove only that appellants had planned and intended that Whitice would understand the possibility that harmful consequences could be attendant upon his default or delinquency. United States v. Annoreno, 7 Cir. 1972, 460 F.2d 1303, 1309 n. 7; *see* Carbo v. United States, 9 Cir. 1963, 314 F.2d 718, 740–741, cert. denied, Palermo v. United States, 1964, 377 U.S. 953, 84 S. Ct. 1625, 12 L.Ed.2d 498. In order to prove the substantive violation of § 892, however, it was essential for the government to prove that Whitice actually had such an awareness of the possible harm that could arise from default or delinquency in repaying the loans to Falco.

We find that the government carried its burden both with regard to the conspiracy count and with regard to the substantive count. The testimony clearly showed the existence of a conspiracy between Falco, Coco, and Nash to make extortionate extensions of credit, and it was entirely reasonable for the jury to find that this conspiracy embraced appellants' dealings with Whitice. Likewise, although the loans to Whitice were made by Falco, appellants participated both in the conspiracy to make the extortionate loans and in the collections from Whitice, and there can thus be no question of their culpability for the substantive crime. Pinkerton v. United States, 1946, 328 U.S. 640, 646–647, 66 S.Ct. 1180, 90 L.Ed. 1489, 1496–1497.

Appellants' contention that the court erred in allowing witnesses to testify concerning Whitice's fear of the consequences of non-payment because Whitice was available to give "direct" testimony concerning his understanding of the dangers attendant upon default or delinquency is also without merit. If in order to convict for violations of § 892, the government is required to establish the crime through the testimony of an available victim, the congressional intent to protect citizens from extortionate credit practices could be circumvented by terrorizing the victim. *See* United States v. DeLutro, 2 Cir. 1970, 435 F.2d 255, 256, cert. denied, 1971, 402 U.S. 983, 91 S.Ct. 1658, 29 L.Ed.2d 148. The testimony of an accountant and an attorney who dealt with Whitice when he was being placed in receivership concerning Whitice's obvious fear of missing a payment is ample "direct" evidence of Whitice's state of mind concerning the nature of his loans. The evidence of Whitice's state of mind was perhaps even

5. Appellants also contend that the Goodman, Henzel, Davidow testimony should not have been admitted because these individuals were not named in the indictment and appellants were consequently unable to prepare for trial. In effect, appellants are complaining because the government failed to provide them with a list of prospective witnesses and with information sought in their motion for a bill of particulars. We find no abuse of the trial court's discretion in its refusal to require the government to provide a list of witnesses, United States v. Moseley, 5 Cir. 1971, 450 F.2d 506, 510; United States v. Hancock, 5 Cir. 1971, 441 F.2d 1285, cert. denied, 1971, 404 U.S. 833, 92 S.Ct. 81, 30 L.Ed.2d 63; O'Neal v. United States, 5 Cir. 1969, 411 F.2d 131, cert. denied, 1969, 396 U.S. 827, 90 S.Ct. 72, 24 L.Ed.2d 77, or in its refusal to grant appellants' motions for bills of particulars in their entirety. Hickman v. United States, 5 Cir. 1969, 406 F.2d 414, 415, cert. denied, 1969, 394 U.S. 960, 89 S.Ct. 1309, 22 L.Ed.2d 561.

more probable than any "direct" testimony would have been because it graphically demonstrated that he was aware that harmful consequences could arise from default or delinquency in paying the loans to Falco. *See* United States v. DeCarlo, 3 Cir. 1972, 458 F.2d 358, 363–365.

### B. The Section 894 Convictions

■ In order to find appellants guilty of conspiring to use extortionate means to collect or to attempt to collect extensions of credit from Joel Whitice and Richard Besola in violation of 18 U.S.C. § 894 it was necessary for the jury to find that it was the intent of appellants to use threats or actual violence whenever necessary to collect payments from Whitice and Besola. The jury was presented with ample evidence that this was the *modus operandi* of the enterprise in which appellants were engaged, and the finding that appellants adhered to the conspiratorial plan and conspired to use threats, and violence if necessary to collect payments from Whitice and Besola is entirely reasonable.

■ There was also ample evidence to support the jury finding that appellants had knowingly participated in the express or implicit threat of the use of violence or other criminal means to cause harm to the person, reputation, or property of Joel Whitice in collecting or attempting to collect loan payments from him. As previously discussed in Part III, Subsection A, *supra*, appellants were parties to the making of extortionate extensions of credit to Whitice, extensions of credit which by their very definition were based upon Whitice's understanding that default or delinquency might result in the use of violence. Thus any collections on the extortionate extensions of credit to Whitice made by appellants, who knew of the extortionate character

of the loans, necessarily involved the implicit threat of the use of violence in violation of 18 U.S.C. § 894. In short, by accepting payments from Whitice, with knowledge of the extortionate nature of his loan, appellants "participated" in an extortionate collection means within the meaning of 18 U.S.C. § 894.

### C. The Section 1951 Conviction

Appellants were also convicted of obstructing interstate commerce by extorting payments from Joel Whitice in violation of the Hobbs Act, 18 U.S.C. § 1951. They contend that this conviction cannot stand because there was no showing that Whitice was in fear and because the loan to Whitice was made personally to him, and not to Food Palace, Inc., his store, which purchased articles in interstate commerce.

■ In order to establish a violation of the Hobbs Act it was necessary for the government to show: (1) that appellants induced Whitice to part with property; (2) that they did so through the wrongful use of actual or threatened force, violence or fear; and (3) that in so doing they adversely affected interstate commerce. United States v. Addonizio, 3 Cir. 1972, 451 F.2d 49, 59, cert. denied, 1972, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812; United States v. Tolub, 2 Cir. 1962, 309 F.2d 286. Under the Hobbs Act it is not necessary that the subject of the extortion constitute interstate commerce, or that the purpose of the extortion be to affect interstate commerce. All that is required is that trade be affected by extortion "in any way or degree," Carbo v. United States, 9, Cir. 1963, 314 F.2d 718, 732; [6] *see* United States v. Addonizio, *supra*, 451 F.2d at 77, and that the victim have been induced to part with property through the use of fear. United States v. Tolub, *supra*. As discussed in earlier

---

6. In Carbo v. United States, *supra*, the court held that an extortionate transaction which affected a contract between a professional prize fighter and his manager, as well as the prize fighter's earnings, had sufficient effect on interstate commerce to support a Hobbs Act conviction because the interstate business of promoting professional championship boxing contests was affected in some degree by extortion aimed at obtaining control of a professional fighter. 314 F.2d at 732.

portions of this opinion, there was ample evidence from which the jury could determine that appellants participated in a scheme in which Whitice was induced by a reasonable fear to make payments on his loan, and that interstate commerce was affected by his inability to make payments to suppliers who were engaged in interstate commerce.

### D. Coco's Section 894 Conviction

 Appellant Coco, alone, was indicted and convicted for using extortionate means to collect or to attempt to collect extensions of credit from Richard Besola in violation of 18 U.S.C. § 894. He challenges this conviction on the ground that there was no evidence that Richard Besola had ever been threatened or placed in fear in connection with the loan payments that he made to Coco. At the trial, Besola testified that he was not personally afraid of Coco or Falco, however, he also testified that his family was in fear because of his transactions with Falco and Coco and that they communicated this anxiety to him. Moreover, Besola testified that he was concerned about paying off his loan and that "I knew after a few weeks that the people that I borrowed money from weren't exactly bankers." He further testified that there was always a possibility that Falco or Coco could send somebody out to put pressure on him and that he was aware that Coco had been involved in a shooting. Although Besola denied being in fear of Coco or Falco, the jury could reasonably have discounted this statement [7] and found from Besola's other testimony that Coco had participated in the collection of a loan by the use of implicit threats.[8]

### IV. THE TAPE RECORDING

 Appellants contend that the District Court erred in admitting into evidence a legally obtained tape recording of a conversation that appellant Coco had with a party not involved in the indictment approximately ten months after the events charged in the indictment. In this conversation, Coco made a statement concerning what he would do to delinquent borrowers—that he would "bust their heads with his knuckles." This tape recording was admitted only with regard to appellant Coco and only for the limited purpose of showing his intent to commit the crimes charged in the indictment. Appellants recognize the general rule that events occurring subsequent to the crime charged in the indictment are admissible to show intent, where intent is an element of the offense charged, if the events are not "too remote in point of time from the offense charged." Matthews v. United States, supra, 407 F.2d at 1381; see United States v. Goodwin, 5 Cir. 1972, 470 F.2d 893, 899. They nevertheless contend that the tape was not admissible to show Coco's intent for two reasons: (1) persons not named in the indictment were mentioned in the tape recording, and (2) the tape was too remote in time to the events named in the indictment. "Evidence that similar or related offenses were committed over a period of time tends to show a consistent pattern of conduct highly relevant to the issue of intent." Gilstrap v. United States, 5

---

7. There are numerous reasons why the jury could discount Besola's direct denial of fear and infer from his other testimony concerning the loan transaction that he had been implicitly threatened. For example, two logical explanations might be that: (1) his denials of fear were merely the bravado of a man anxious to maintain his *machismo*; or (2) his denials of fear were induced by a fear of testifying adversely to an individual who was known to him to be of a violent character.

8. Appellants reliance on the acquittals in United States v. Falcone, 1940, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128, Carbo v. United States, supra, and United States v. Webb, 6 Cir. 1966, 359 F.2d 558, is unfounded. In all of those cases the conspiratorial convictions were reversed because there was no showing of a knowing participation in the charged illegal conspiratorial plan. In the case before us there is ample evidence that appellants knowingly adhered to and participated in the conspiratorial and substantive offenses charged.

Cir. 1968, 389 F.2d 6, 9. Since intent is an element of all of the offenses for which Coco was charged, and since the tape recording contained a conversation concerning Coco's method of dealing with delinquent borrowers, it is clear that the tape was admissible to show his intent to commit the crimes for which he was charged. Moreover, the trial court had discretion to weigh the prejudicial character of the conversation against its relevancy, United States v. Bell, 5 Cir. 1972, 457 F.2d 1231, 1237, and in light of the fact that Coco's conversation concerned a similar criminal transaction occurring less than one year after the events charged in the indictment, we find no abuse of that discretion. *See* Nees v. Culbertson, 5 Cir. 1969, 406 F.2d 621, 625, cert. denied, 1969, 395 U.S. 959, 89 S.Ct. 2098, 23 L. Ed.2d 745; Miller v. United States, 5 Cir. 1968, 397 F.2d 272, 274.[9]

## V. THE "IMPROPER" TESTIMONY

Appellants allege that the District Court erred in failing to grant their motions for mistrial based upon the following testimonial incidents, which appellants claim denied them a fair trial:

■ (1) When government witness Goodman was asked what was said at the first time that Nash, Falco and Coco came together, he answered: "The first time I met Mr. Coco, this was with reference to seeing if I could get his probation—" at which point the government cut him off. Appellants contend that Goodman's voluntary statement naturally led the jury to infer that Coco had been convicted of a prior crime, *see* United States v. Reed, 7 Cir. 1967, 376 F.2d 226, and thus denied him a fair trial by prejudicing the jury. *See* Michelson v. United States, *supra*. The government responds that a mistrial is not warranted if the challenged testimony was blurted out by a witness, *see* United

States v. Jacangelo, 3 Cir. 1960, 281 F. 2d 574, 576, unless there is a clear showing of prejudice. In light of the fact that Coco himself introduced a tape recording of an interview with Richard Besola that included a clear inference that Coco had been imprisoned, we find that Coco's substantial rights were not affected by Goodman's testimony. *See* Rule 52, F.R.Crim.P.; Porter v. United States, 1958, 103 U.S.App.D.C. 385, 258 F.2d 685, cert. denied, 1959, 360 U.S. 906, 79 S.Ct. 1289, 3 L.Ed.2d 1257. We do not in any way see how Nash's substantial rights might have been violated.

■ (2) Goodman also made two conclusory statements to the effect that appellants were partners with Falco in the shylocking business. Appellants' objections to these statements were sustained and the jury was directed to disregard them. We think that the trial judge's timely ruling and instructions fully safeguarded appellants' rights.

■ (3) Appellants allege that Goodman's testimony concerning Seaman's death in an automobile accident contained an implication that appellants were responsible for Seaman's death and that their motions for a mistrial based on this testimony should therefore have been granted. Goodman testified: "I asked Mr. Nash, because I knew him best of anybody, about if he knew anything of what happened to Ray Seaman. He said, 'Well, he fell in the canal and he had a big mouth—nobody cared.'" Goodman then testified that "Mr. Coco did not say anything. He just smiled." We find no error in the denial of appellants' motions for a mistrial. Goodman's testimony merely related appellants' own statements and actions. Any inuendo of wrongdoing raised by Goodman's testimony was thus derived solely from appellants' own statements and actions and constituted admissions concerning conduct taken in furtherance of

---

**9.** In Miller v. United States, *supra*, this Circuit approved the admission of evidence concerning an uncharged illegal transaction in order to show the accused's intent, even though the crime had occurred five years prior to the crime under consideration.

the general conspiracy. *See* United States v. Pierce, 5 Cir. 1969, 411 F.2d 678; Tucker v. United States, 5 Cir. 1960, 279 F.2d 62, 64; United States v. Steel, 10 Cir. 1972, 458 F.2d 1164; United States v. Alker, 3 Cir. 1958, 255 F.2d 851.[10]

■ (4) Government witness Henzel testified that Nash had told him that money Henzel had borrowed from Nash "came from underworld elements, Mafia, and so forth." Appellants claim that this testimony was so prejudicial that the Court should have declared a mistrial. Although the mention of the "Mafia" may elicit fear and distaste in the minds of the average juror, it undoubtedly may also cause such a response in the average debtor, and we find that Henzel's testimony was so relevant to the crimes charged in the indictment that there was no error in its being considered by the jury. The fact that Nash told Henzel—an individual to whom he had lent money at exorbitant rates—that the money came from the "Mafia" was quite relevant in showing Nash's intent to put Henzel in fear and in showing the method of operation of the conspiracy. Any prejudice that might have been aroused through the use of the term "Mafia" was insignificant in comparison with the probative value of the fact that Nash used that term, and we find that the District Court did not abuse its discretion in striking the balance between relevancy and prejudice. United States v. Bell, *supra*. We therefore reject appellants' challenge to the fairness of their trial based upon the introduction of "improper" testimony.

## VI. COCO'S MOTION FOR A SEVERANCE

Appellant Coco contends that the District Court erred in refusing to grant his motion for a separate trial. He contends that four statements Nash made to FBI investigators exculpated him and that he was prejudiced by his inability to call Nash to the stand to question him concerning the statements.

■ The grant or denial of a motion for a separate trial under Rule 14 F.R.Crim.P. is largely a matter for the discretion of the trial judge. Opper v. United States, 1954, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101; Smith v. United States, 5 Cir. 1967, 385 F.2d 34, 37. Only if the defendant can demonstrate a clear showing of prejudice resulting in the denial of a fair trial will the discretionary ruling of the trial judge be reversed on appeal. United States v. Iacovetti, 5 Cir. 1972, 466 F.2d 1147, 1153; Smith v. United States, *supra*. Coco did not make a convincing showing that Nash would be more likely to give exculpatory testimony for Coco if the trials were severed,[11] Byrd v. Wainwright, 5 Cir. 1970, 428 F.2d 1017, 1022, and we find that the District Court did not abuse its discretion in denying Coco's

---

10. Assuming that there is an inuendo of wrongdoing in appellants' statement and actions, they do not constitute confessions to the crimes charged, but rather admissions concerning the general conspiracy, which were probative of appellants' intent to use force in furtherance of the conspiracy, and thus we are not faced with any of the problems raised by the admission of a co-defendant's confession to the crimes charged. *See* Bruton v. United States, 1968, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476.

11. At trial, the only showing that Coco made that Nash *might* testify is contained in the following colloquy between Coco's attorney and Nash's attorney:

Coco's attorney: "Are you saying now that if the Court were to grant a severance and your client, Mr. Nash, were tried first and if he were acquitted, that he would subsequently testify in Mr. Coco's trial?"

Nash's attorney: "I am saying if that course of events took place, that there would certainly be serious consideration of his testifying."

On these facts, Coco's contention of prejudice is at best speculative, since Nash would only consider testifying *if he were acquitted*, and "[w]e do not conjecture abuses of discretion." Smith v. United States, *supra*, 385 F.2d at 38.

motion for a separate trial. . United States v. Iacovetti, *supra*, 466 F.2d at 1153; Smith v. United States, *supra*, 385 F.2d at 38.

Relying on DeLuna v. United States, 5 Cir. 1962, 308 F.2d 140, Coco also contends that a separate trial should have been granted so that in the event that Nash took the stand and claimed the Fifth Amendment, Coco would have been able to urge the jury to draw favorable inferences from Nash's refusal to testify. The *DeLuna* ruling, which recognized the right of defendants in certain circumstances to comment on the failure of a co-defendant to testify, is, however, limited only to those occasions where the defendants' defenses are based on mutually exclusive theories of guilt, United States v. Hyde, 5 Cir. 1971, 448 F.2d 815, 832, cert. denied, 1972, 404 U.S. 1058, 92 S.Ct. 736, 737, 30 L.Ed.2d 745, that would create a duty upon counsel to comment upon the refusal of the other defendant to testify. Gurleski v. United States, 5 Cir. 1968, 405 F.2d 253, cert. denied, 1969, 395 U. S. 981, 89 S.Ct. 2140, 23 L.Ed.2d 769. No such mutually exclusive defense theories are presented in the instant prosecution.

### VII. COCO'S MOTION FOR A CONTINUANCE

Near the close of the trial Coco moved for a two hour continuance or for permission to reopen so that he could introduce rebuttal testimony from Richard Besola's son. Coco alleged that he was taken by surprise when Richard Besola testified that his family had been fearful because of his dealing with Coco and Falco because Besola had denied any fear in a pre-trial conversation with Coco's attorney. Coco alleged that Richard Besola's son would testify that the family was not in fear. The Court denied Coco's motions on the grounds that

(1) there was no surprise, and (2) Coco could have subpoenaed the son either before the trial began or on the evening prior to the close of the trial, immediately after he was allegedly "surprised." After considering (1) the text of Richard Besola's pretrial conversation with Coco's attorney, (2) his "surprise" trial testimony, (3) a transcript of Besola's son's allegedly contradictory remarks, and (4) Coco's attorney's statements concerning the failure to timely subpoena Besola's son, we do not find that the trial court erred in determining that Coco was not surprised and that he had failed to exercise due diligence in subpoenaing Besola's son. We therefore hold that the District Court did not abuse its discretion in denying Coco's motion for a continuance, United States v. Roca-Alvarez, 5 Cir. 1971, 451 F.2d 843, and his motion to reopen. United States v. Burger, 5 Cir. 1969, 419 F.2d 1293.

### VIII. THE GRAND AND PETIT JURY PANELS

Appellants' final contention is that they were denied a fair trial because the grand and petit jury selection methods utilized at the time and place of their indictment and trial excluded two groups of potential jurors: young voters and Cuban Americans. This argument has been considered at length and rejected by this Circuit in United States v. Gooding, 5 Cir. 1973, 473 F.2d 425, and we are bound by the rationale and decision in that case.

### IX. CONCLUSION

Appellants have raised a skillful but unconvincing multifaceted attack on their convictions. Being firmly convinced that appellants received a fair trial and that the jury's verdict was supported by the evidence, we affirm.

Affirmed.