**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Francisco ALETTO, Sr., Defendant–**
**Appellant.**

No. 15–10309
Non–Argument Calendar.

United States Court of Appeals,
Eleventh Circuit.

March 11, 2016.

Lisa Tobin Rubio, Wifredo A. Ferrer, Kathleen Mary Salyer, Emily M. Smachetti, U.S. Attorney's Office, Miami, FL, Mark Dispoto, U.S. Attorney's Office, Fort Lauderdale, FL, for Plaintiff–Appellee.

Arthur Louis Wallace, III, Wallace Associates, Lighthouse Point, FL, for Defendant–Appellant.

Before HULL, MARCUS, and ROSENBAUM, Circuit Judges.

PER CURIAM:

After a jury trial, Francisco Aletto was convicted of one count of making an extortionate extension of credit, in violation of 18 U.S.C. § 892(a), and one count of using extortionate means to collect and attempt to collect extensions of credit, in violation of 18 U.S.C. § 894(a). Aletto challenges his convictions on two main grounds. First, Aletto contends that the evidence was insufficient to show that he made extensions of credits or that he used extortionate means. Second, he argues that the district court violated his right to conflict-free counsel by allowing him to waive the conflict of interest without informing him that he could obtain the advice of independent counsel. After careful review, we find that sufficient evidence supports Aletto's convictions and that he knowingly and intelligently waived his right to conflict-free counsel. Therefore, we affirm.

## I.

In a superseding indictment, a federal grand jury charged Aletto with one count of knowingly and intentionally making an extortionate extension of credit on or about August 7, 2010, in violation of 18 U.S.C. § 892(a) ("Count 1"), and one count of knowingly and intentionally participating, along with several codefendants, in the use of extortionate means to collect and attempt to collect extensions of credit, in violation of 18 U.S.C. § 894(a)(1) ("Count 3"). Aletto pled not guilty and proceeded to trial. Most of his codefendants pled guilty.

At trial, the government's evidence consisted primarily of testimony from the victim, Eduardo Virguetti, and his daughter. This evidence, in the light most favorable to the government, showed that Virguetti, a Bolivian national living in the United States without authorization, and his daughter, a legal resident, owned a gas station in Boca Raton, Florida.[1] Virguetti needed money to buy inventory for his store. Unable to obtain a loan from a bank, Virguetti went to a pawn shop owned by Aletto to try to pawn a necklace.

At the pawn shop, Virguetti met Aletto, who, after hearing Virguetti's story, offered to give him $10,000 in cash with no collateral at an interest rate of 15% per month. Virguetti accepted and agreed to make weekly interest payments of $375 each Saturday at the pawn shop. Shortly thereafter, Aletto proposed entering into a partnership with Virguetti. Virguetti declined the partnership offer, prompting Aletto to demand collateral for the $10,000.

---

1. In reviewing a sufficiency challenge, we construe the facts in the light most favorable to the conviction. *See United States v. Howard,* 742 F.3d 1334, 1338 (11th Cir.2014).

Over time, Aletto introduced Virguetti to three associates, named as codefendants in the superseding indictment, from whom Virguetti borrowed a total of $30,000 on the same terms as his original agreement with Aletto (weekly interest payments of $375 per $10,000). It was often confusing to Virguetti, and even the creditors, to whom he owed money, as Aletto generally collected the weekly payments, and the creditors would transfer Virguetti's debts to each other.

When Virguetti needed money on a short-term basis, he borrowed smaller amounts from Aletto, typically between $1,000 and $3,000, for a fee. Virguetti would borrow the money in the morning, and Aletto expected to be paid back by the end of the business day. One day in July 2010, Virguetti was unable to repay Aletto the same day and told him so. Aletto angrily demanded his money from Virguetti. When Virguetti asked what would happen if he did not repay the money, Aletto responded that he would kill Virguetti.

On or about August 7, 2010, Aletto personally loaned Virguetti another $10,000 in cash at a weekly interest rate of 2% (the offense conduct charged in Count 1).[2] This transaction was memorialized in a promissory note, signed by Virguetti, which stated that the money was to be repaid in 60 days.

Eventually, Virguetti began to have trouble making interest payments on time. This, in turn, caused Aletto and his codefendants to make veiled or explicit threats to Virguetti and his daughter. For example, Virguetti's daughter testified that, on one occasion, Aletto came to the gas station looking for Virguetti, who was not there, and he demanded that Virguetti pay back the principal he owed. Virguetti's

daughter argued that they had paid Aletto enough. Aletto then mimicked a gun with his hand and pointed it at his head while stating that he would shoot Virguetti in the head if they did not repay Aletto. Another time, one of the codefendants showed Virguetti a gun when attempting to collect a debt.

At some point late in 2010, the Federal Bureau of Investigation ("FBI") began an investigation into whether Virguetti was being extorted. When questioned by FBI agents, Aletto described the original $10,000 he gave to Virguetti as a "bad loan." In the context of the interview, the FBI agent understood Aletto to mean it was a loan-shark loan.

The jury returned a verdict finding Aletto guilty of both Counts 1 and 3. The district court sentenced Aletto to a total term of 24 months in prison. Aletto now appeals.

## II.

We review *de novo* the sufficiency of the evidence to support a conviction. *United States v. Howard*, 742 F.3d 1334, 1341 (11th Cir.2014). We view the evidence presented at trial, and draw all reasonable inferences therefrom, in the light most favorable to the verdict. *United States v. Sterling*, 738 F.3d 228, 234 (11th Cir.2013). We will not disturb a guilty verdict unless no reasonable trier of fact could have found that the evidence establishes the defendant's guilt beyond a reasonable doubt. *Howard*, 742 F.3d at 1341. "We do not second guess the jury's determination of credibility issues. Nor will we reverse a conviction simply because the defendant put forth a reasonable hypothesis of innocence at trial." *Id.* at 1342 (cita-

**2.** It appears that the money was actually given on July 31, 2010, and the promissory note was signed later. Regardless, both parties generally refer to this transaction as occurring on August 7, 2010, so for the sake of consistency we do as well.

tions and internal quotation marks omitted).

## A.

Section 892(a) of Title 18 of the United States Code prohibits making "any extortionate extension of credit." 18 U.S.C. § 892(a). An "extension of credit" is broadly defined as a loan or "any agreement, tacit or express, to defer the repayment or satisfaction of any debt or claim." *United States v. Cassano*, 132 F.3d 646, 649–50 (11th Cir.1998); *see* 18 U.S.C. § 891(1) ("[T]o extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred.").

An extension of credit is "extortionate" where "both the creditor and the debtor understand that default or delinquency in making payments 'could result in the use of violence or other criminal means to cause harm to the person, reputation or property of any person.'" *United States v. Nakaladski*, 481 F.2d 289, 297 (5th Cir. 1973) (quoting 18 U.S.C. § 891(6)).[3] "The states of mind of the defendant and the debtor are, therefore, both essential elements of the crime of making extortionate extensions of credit under § 892." *United States v. Lombardozzi*, 491 F.3d 61, 68 (2d Cir.2007). With respect to the debtor's state of mind, the government must prove that the debtor "actually had such an awareness of the possible harm that could arise from default or delinquency in repaying the loans." *Nakaladski*, 481 F.2d at 297.

■ Sufficient evidence supports Aletto's conviction under § 892(a). First, a reasonable jury could find that Aletto made an "extension of credit" to Virguetti on or about August 7, 2010, as charged in Count 1 of the superseding indictment. The evidence shows that, on or around that date, Aletto loaned Virguetti $10,000 in cash at 2% weekly interest rate. In a promissory note, Virguetti agreed to repay Aletto in 60 days. Clearly, this evidence was sufficient to show that this transaction was either a "loan" or an agreement to defer repayment of Virguetti's debt to Aletto. *See* 18 U.S.C. § 891(1); *Cassano*, 132 F.3d at 649.

The evidence does not support Aletto's position that the $10,000 was an "investment" by a business partner, nor would that characterization be dispositive in any case. *See Cassano*, 132 F.3d at 649–50 (recognizing that an "extension of credit" may arise from deferment of payments on legitimate investments and joint ventures, in addition to various other debts). Virguetti declined Aletto's partnership offer early on. The evidence of their interactions from that point, including the weekly interest payments, Aletto's requiring of collateral to secure repayment of the principal amounts, and Aletto's own statements that he made a "bad loan" to Virguetti, fully supports the inference that Aletto and Virguetti's relationship was that of a creditor and debtor.

Second, a reasonable jury could conclude beyond a reasonable doubt that the August 2010 extension of credit was "extortionate" based on the circumstances surrounding its making.[4] While the government need

---

**3.** This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ).

**4.** Aletto incorrectly states that a conviction under § 892(a) requires evidence that "the debtor believed, at the time the credit was extended, that the defendant previously used extortionate means to collect a debt or had a

not necessarily present evidence of an explicit threat to the debtor, the government did so in this case. *See Lombardozzi*, 491 F.3d at 69 (stating that "the victim borrower's state of mind can be inferred" and "does not necessarily depend on evidence of explicit threats made by the creditor"); *see also* 18 U.S.C. § 891(7) ("extortionate means" include the "express or implicit threat" of the use of violence or other criminal means).

Less than a month before Aletto made the August 2010 extension of credit, he explicitly threatened Virguetti with violence when Virguetti was late repaying a short-term loan. On that date in July 2010, Virguetti met with Aletto to tell him he could not repay by the end of the day the $2,000 he borrowed that morning. Aletto became very angry, placed himself inches from Virguetti's face, and told him, "You need to pay me my money, now." Virguetti responded, "If I don't pay ... you kill me?" Aletto replied, "Yes, I do." Virguetti testified that he took this threat seriously and that he was scared of Aletto.

Crediting this testimony, a reasonable jury could conclude that, when Aletto made the August 2010 extension of credit, which was five times the amount of the loan that prompted Aletto to threaten Virguetti, the defendant and the debtor both understood that harmful consequences could result from delinquency or delay in repaying the loan. *See Nakaladski*, 481 F.2d at 297–98. The extortionate nature of the loan is also supported by evidence that Aletto made high-interest, predatory loans to someone he knew was desperate for money and unlikely to inform authorities due to his immigration status, that he demanded excessive collateral for those loans, and that he recruited others to make money from Virguetti and his family. Aletto essentially contends that Virguetti's testimony regarding Aletto's threat and whether Virguetti took it seriously is not worthy of credence, but we will not second-guess the jury's credibility determinations. *See Howard*, 742 F.3d at 1342. Nor will we reverse Aletto's conviction simply because he put forth a reasonable hypothesis of innocence at trial. *See id.* In short, sufficient evidence supports Aletto's § 892(a) conviction.

**B.**

Section 894(a)(1) prohibits using "any extortionate means" "to collect or attempt to collect any extension of credit." 18 U.S.C. § 894(a)(1). Section 891 defines "extortionate means" as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(7).

■ Here, the evidence presented was sufficient for a jury to find that Aletto participated in using threats of violence to collect or attempt to collect an extension of credit. Aletto contends that the only threats came from his codefendants and that he is not culpable for their conduct. But even if we limited our inquiry solely to Aletto, the evidence was more than sufficient to show that Aletto personally threatened Virguetti and his family with violence in attempting to collect extensions of cred-

reputation for doing so." Aletto's Initial Br. at 43–44. That element is part of § 892(b), which provides a specific way for the government to show that an extension of credit was extortionate, but subsection (b) "is nonexclusive and in no way limits the effect or applicability of subsection (a)." 18 U.S.C. § 892(b).

Likewise, the fact that the promissory note may have been legally enforceable, as Aletto asserts, is not dispositive of whether the extension of credit was extortionate. Enforceability is an element of the nonexclusive showing under § 892(b). *See* 18 U.S.C. § 892(b)(1).

it. First, as mentioned above with respect to Count 1, Aletto threatened Virguetti when he was late repaying a short-term loan. Second, Virguetti's daughter testified that Aletto came to the gas station to collect on Virguetti's debt and threatened to shoot Virguetti in the head if the debt was not repaid. The jury was free to fully credit this testimony and conclude that Aletto knowingly used means involving the threat of violence to attempt to collect extensions of credit. 18 U.S.C. §§ 891(7), 894(a); *see Howard,* 742 F.3d at 1341–42. Accordingly, we affirm Aletto's § 894(a) conviction.

## III.

Aletto next argues that the district court erred in not declaring a mistrial based upon a conflict of interest between Aletto and his trial counsel, Michael J. Silver.[5] Aletto is represented by different counsel on appeal.

During trial, and outside the presence of the jury, Virguetti's daughter recognized Silver. The district court questioned Virguetti's daughter, who stated that Silver came to the gas station, represented that he was Aletto's lawyer, and threatened to "call immigration" on the Virguetti family if the debt to Aletto was not paid. The government moved for a mistrial because Virguetti's daughter's testimony could make Silver a witness in the case. The district court questioned Aletto under oath about his rights and the potential conflict, and Aletto stated that he understood the conflict and wished to proceed with Silver. Ultimately, the district court denied the government's motion for a mistrial and

prohibited the government from eliciting any testimony from Virguetti's daughter about her belief that Aletto's attorney threatened her.

The question of whether a defendant waived his counsel's conflict of interest is a mixed question of fact and law that we review *de novo. See Hamilton v. Ford,* 969 F.2d 1006, 1010 (11th Cir.1992) (analyzing conflict-of-interest claims under 28 U.S.C. § 2254).

An actual conflict of interest that adversely affects a defendant deprives him of his Sixth Amendment right to effective assistance of counsel. *United States v. Rodriguez,* 982 F.2d 474, 477 (11th Cir. 1993). In general, however, a defendant may waive his right to conflict-free counsel and choose to proceed with conflicted counsel. *Id.; see United States v. Garcia,* 517 F.2d 272, 276 (5th Cir.1972). An effective waiver of a constitutional right must be voluntary, knowing, and intelligent, and it must be "established by clear, unequivocal, and unambiguous language." *Garcia,* 517 F.2d at 276–78 (internal quotation marks omitted). "The record should show, in some way, that the defendant was aware of the conflict of interest; realized the conflict could affect the defense; and knew of the right to obtain other counsel." *Rodriguez,* 982 F.2d at 477.

■ Here, Aletto waived his right to conflict-free counsel. The district court inquired of Aletto under oath in a manner similar to that used in a plea colloquy. *See Garcia,* 517 F.2d at 278 (describing the procedure to obtain a valid waiver). Aletto's responses show that he understood the potential conflict and the consequences of

---

5. We note that Aletto opposed the government's motion for a mistrial and therefore arguably invited any error, as the government contends. But given the allegations against Aletto's counsel, the possibility counsel may have had conflicting motivations in arguing against a mistrial, and the fact that we nevertheless conclude that the district court properly found that Aletto waived the conflict, we do not consider whether Aletto invited error in this case.

proceeding with Silver—that Silver could not deny that he had acted improperly. Further, the court informed Aletto that he had the right to conflict-free counsel and the right to consult with another lawyer before deciding whether to proceed with Silver. Following the court's inquiry, Aletto unambiguously stated that he voluntarily waived his right to conflict-free counsel and wished to proceed with Silver. On this record, it is clear that Aletto knowingly and intelligently waived his right to conflict-free counsel. *See Rodriguez,* 982 F.2d at 477.

Nor has Aletto shown that the potential conflict of interest affected him adversely in any way because the district court prohibited the government from eliciting testimony about Silver's actions in allegedly threatening Virguetti's daughter. *See id.*

### IV.

For the reasons stated, we affirm Aletto's convictions.

**AFFIRMED.**