549 F.2d 517
 40 A.L.R.Fed. 907, 1 Fed. R. Evid. Serv. 633
 UNITED STATES of America, Appellee,
v.
James JACKSON, Appellant.
UNITED STATES of America, Appellee,
v.
Harold HUDSON, Appellant.
UNITED STATES of America, Appellee,
v.
Lushrie JARDAN, Appellant.
UNITED STATES of America, Appellee,
v.
Spencer MIMS, Appellant.
UNITED STATES of America, Appellee,
v.
Nathaniel MUHAMMAD, Appellant.
 Nos. 76-1093 to 76-1095, 76-1105 and 76-1112.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 11, 1976.
Decided Feb. 8, 1977.
Rehearing Denied in Nos. 76-1094-95 March 9, 1977.
Rehearing and Rehearing En Banc Denied in No. 76-1112 March
2, 1977 and in No. 76-1105 March 10, 1977.
Certiorari Denied April 25, 1977.
See 97 S.Ct. 1682.
 
 Charles A. Gallipeau, Kansas City, Mo., for Jackson.
 Mark W. Slatkin, Kansas City, Mo., for Hudson.
 David F. Williams, Kansas City, Mo., for Jardan.
 Lewis E. Pierce, Kansas City, Mo., for Mims.
 David W. Russell, Kansas City, Mo., for Muhammad.
 Bert C. Hurn, U. S. Atty., Michael De Feo (argued), and William M. Tetrick, Jr., Sp. Attys., U. S. Dept. of Justice, Kansas City, Mo., on brief, for appellee.
 Before GIBSON, Chief Judge, and HEANEY and WEBSTER, Circuit Judges.
 GIBSON, Chief Judge.
 
 
 1
 This case involves a major drug distribution scheme centered in Kansas City, Missouri. In September, 1975, a fifteen count indictment was returned against James Jackson, Nathaniel Muhammad, Lushrie Jardan, Harold Hudson, Spencer Mims and Juan Pablo Garcia,[1] charging a conspiracy to distribute heroin and cocaine and to possess heroin and cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846. In addition to the single count of conspiracy, Jackson was also charged with ten substantive counts alleging distribution of heroin or cocaine in violation of 21 U.S.C. § 841(a)(1) and with three counts alleging distribution of heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.[2] Muhammad and Mims were each charged with two substantive counts of unlawful distribution of heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Hudson was charged only with conspiracy, as was Juan Pablo Garcia, who pled guilty prior to trial. The remaining five defendants, appellants here, were tried jointly and convicted as charged after an extensive jury trial.
 
 
 2
 The evidence portrays a well organized illegal conspiracy for the sale and distribution of controlled substances extending at least from early January, 1975 until July 23, 1975. Probative evidence of at least 61 overt acts, thirteen of which constituted substantive violations of federal narcotics law, was presented to the jury. Starting on March 7, 1975, Jackson made a series of seventeen sales of heroin or cocaine to federal agents or informants. Fifteen of these sales were made to Harold T. Vaughan, a special agent for the Drug Enforcement Administration (DEA). Jackson was the sole conspirator present at these illegal sales. His conduct during the course of the conspiracy, however, established a salient pattern of frequent contacts with Muhammad, particularly during negotiations for sales of narcotics and before and after these sales. On May 9, 1975, for example, Jackson visited Muhammad's residence both before and immediately after a sale of three ounces of heroin to Agent Vaughan. On both May 13 and May 31, Jackson went directly to Muhammad's residence following two sales of $1,800 worth of heroin each. On June 5, 1975, Jackson bifurcated a sale of seven ounces of heroin by first delivering five ounces to Agent Vaughan, then meeting with Muhammad and Mims, and finally returning to Vaughan with the remaining two ounces. Jackson visited Muhammad's residence immediately after completing the second part of the sale. On June 13, Jackson proceeded from a sale of twelve grams of cocaine directly to Muhammad's residence. On June 30, after Jackson sold 50 grams of heroin to Vaughan for $3,000 and boasted of "his man's" ability to bring a large quantity of 80% pure heroin to Kansas City, he immediately drove to Muhammad's residence. On July 9, Jackson went directly from Muhammad's residence to Vaughan's apartment, where a sale of 26 grams of heroin was made, and then returned to Muhammad's residence by a circuitous route. When, on July 11, Vaughan paid Jackson the balance of $1,300 due on the July 9 purchase, Jackson proceeded straight to Muhammad's residence. Finally, on July 23, Muhammad met with Jackson at Jackson's residence prior to Jackson's sale of thirteen grams of heroin to Vaughan for $1,600. Following this sale, Jackson drove to Muhammad's residence. When Muhammad was arrested on July 23, agents discovered on his person $1,000 in bills with pre-recorded serial numbers which had been given by Vaughan to Jackson for the thirteen grams of heroin. When Jackson was arrested on that same day, the remaining $600 in bills with pre-recorded serial numbers was recovered from him.
 
 
 3
 Court-approved wiretaps of the telephones of Jackson, Mims and Jardan produced evidence of various conversations between Jackson and Mims and between Mims and Jardan which were interpreted by federal agents to relate to sales of narcotics. Mims, Jardan and Hudson were participants in an arrangement with Garcia which involved the purchase of a large amount of heroin. Mims and Jardan traveled to El Paso, Texas, on June 14, 1975, where they obtained approximately one kilogram of brown heroin from Garcia, a citizen of Mexico. Although they paid Garcia only $7,000 of the $40,000 purchase price, he allowed them to take the heroin back to Kansas City, on the understanding that Jardan would quickly acquire the additional money, return to El Paso and pay Garcia in full. After a fruitless three day wait in El Paso, Garcia telephoned Jardan, who quibbled over the quality of the heroin and sought to obtain a lower price. It was agreed that the heroin would be returned to Garcia by a man with a missing finger, defendant Hudson. On June 17, Hudson delivered a package to Garcia in El Paso, which was short approximately one-quarter kilo. Hudson stated that he "really (didn't) know anything about that", but called Jardan, talked to him and then allowed Garcia to talk to him. Eventually Jardan and Garcia reached a new agreement for the purchase of twenty ounces of the heroin. They were arrested on July 10, 1975 in New Orleans, Louisiana, where they were meeting to consummate the first step of the new deal. A search of Garcia's hand luggage following his arrest revealed twenty ounces of heroin.
 
 
 4
 Defendants' joint jury trial commenced on December 1, 1975, and ended on December 13, 1975, with their convictions on all charges. All defendants appeal.
 
 
 5
 * Muhammad, Mims and Jackson challenge the validity of the voir dire examination conducted by the trial court. They contend that this case was " unusually sensitive" because of its concurrent racial and religious aspects and that a "most searching and most thorough" examination of jurors was, accordingly, required in order to reveal prejudice. It is defendants' position that the only adequate means of voir dire examination under the circumstances of this case would have been an in camera questioning of individual veniremen by defense attorneys.
 
 
 6
 All defendants requested permission to conduct voir dire examination themselves, assisted by experts. Muhammad filed a written pretrial motion requesting in camera voir dire by defense counsel. An evidentiary hearing was held at which defendants presented expert testimony on the question of racial prejudice. The trial court subsequently overruled defendants' motions and determined that it would adhere to the usual practice in the Western District of Missouri and conduct the voir dire examination itself. The trial court solicited initial and follow-up questions from defense counsel. Counsel for Jardan and Muhammad proffered and the court considered a total of 252 voir dire questions. The court also announced its willingness to question jurors individually and in camera where general questioning revealed that a particular venireman might be prejudiced.
 
 
 7
 The form and scope of voir dire examination are matters left to the broad discretion of the trial court. Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); United States v. Cosby, 529 F.2d 143, 147 (8th Cir.), cert. denied, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976); Fed.R.Crim.P. 24(a). The trial court here asked most of the approximately 250 questions submitted by defendants, many of which went to the issues of racial prejudice and exposure to pretrial publicity. Where general questioning revealed potential prejudice, follow-up questioning of individual veniremen was conducted by the trial court in camera. Examination was particularly penetrating with regard to the sensitive issues of exposure to pretrial publicity and racial prejudice. See Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); United States v. Crow Dog, 532 F.2d 1182, 1198 (8th Cir. 1976), cert. denied, 426 U.S. 917, 96 S.Ct. 2620, 49 L.Ed.2d 370 (1976); United States v. Bear Runner, 502 F.2d 908 (8th Cir. 1974). A review of the record shows that the trial court's voir dire examination combined careful attention to the identification of possible prejudice with skillful avoidance of the confusion and delay that may arise when a jury is selected in a multiple defendant case where there is the potential of conflicting defenses. We conclude that the trial court did not abuse its discretion in its conduct of the voir dire examination.[3]
 
 II
 
 8
 Many contentions raised on this appeal relate to the question of whether defendants were so prejudiced by the joint trial as to require severance. Defendants were joined pursuant to Fed.R.Crim.P. 8 and the propriety of this initial joinder has not been contested. Rather, each defendant contends that although the initial joinder was proper, prejudice resulted therefrom during the joint trial, mandating a severance under Fed.R.Crim.P. 14.
 
 
 9
 It is the general rule that persons charged in a conspiracy should be tried together, particularly where proof of the charges against the defendants is based upon the same evidence and acts. United States v. Kirk,534 F.2d 1262, 1269 (8th Cir. 1976); United States v. Hutchinson, 488 F.2d 484, 492 (8th Cir. 1973), cert. denied, 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974); United States v. Kahn, 381 F.2d 824, 838 (7th Cir.), cert. denied, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967). Severance will be allowed upon a showing of real prejudice to an individual defendant. United States v. Hutchinson, supra at 492. However, the motion to sever is addressed to the discretion of the trial court, Williams v. United States, 416 F.2d 1064 (8th Cir. 1969), and a denial of severance is not grounds for reversal unless clear prejudice and an abuse of discretion are shown. Johnson v. United States, 356 F.2d 680 (8th Cir.), cert. denied, 385 U.S. 857, 87 S.Ct. 105, 17 L.Ed.2d 84 (1966). A defendant must show something more than the mere fact that his chances for acquittal would have been better had he been tried separately. Williams v. United States, supra at 1070. He must "affirmatively demonstrate that the joint trial prejudiced (his) right to a fair trial." Golliher v. United States, 362 F.2d 594, 603 (8th Cir. 1966). Thus, before the refusal to sever may be deemed an abuse of discretion on the part of the trial court, prejudice to a defendant's right to a fair trial must be established. Relying upon these principles, we now turn to defendants' numerous severance claims.
 
 
 10
 Muhammad contends that the denial of his motion for severance deprived him of the exonerating testimony of his co-defendants. At a pretrial evidentiary hearing, each of Muhammad's four co-defendants testified that he had information that might exonerate Muhammad and that he would be willing to give that information at trial so long as no waiver of his Fifth Amendment rights was required. At the hearing, each co-defendant then exercised his Fifth Amendment privilege and refused to divulge the nature of this allegedly exculpatory information. The trial court declined to sever Muhammad from the forthcoming trial on this basis.
 
 
 11
 At trial, Jackson and Jardan chose to testify on Muhammad's behalf. Hudson and Mims expressed to the trial court their intention to exercise their Fifth Amendment privileges if called and they were not, therefore, called at trial to testify on Muhammad's behalf. Muhammad argues that the denial of his severance motion caused Hudson and Mims not to testify in his favor and that this denial prejudiced his right to a fair trial.
 
 
 12
 At the pretrial hearing, Muhammad supported his motion for severance solely by the statements of his co-defendants that they had or believed that they had information "which may tend to exonerate" Muhammad. No details of the nature, extent or materiality of this purportedly exculpatory evidence were placed before the trial court. Nor did any of the co-defendants, who had affirmatively stated an unwillingness to waive their Fifth Amendment rights, specifically express a willingness to testify in the event Muhammad was tried separately. Severance of Muhammad would not automatically have created an environment in which his co-defendants could have testified without waiving their Fifth Amendment rights. If Muhammad had been severed and tried first, his co-defendants would have had to waive their Fifth Amendment rights in order to testify on his behalf. United States v. Carella, 411 F.2d 729, 731 (2d Cir.), cert. denied, 396 U.S. 860, 90 S.Ct. 131, 24 L.Ed.2d 112 (1969). Thus, the co-defendants' pretrial stance, that they would not waive their Fifth Amendment rights at the forthcoming joint trial, could not be considered equivalent to assurances that they would testify for Muhammad at a separate trial.
 
 
 13
 The trial court was, accordingly, asked to take the extreme step of severing Muhammad without any knowledge of the nature or extent of purportedly exculpatory evidence and without any indications that co-defendants would in fact be willing to offer such evidence in the event of severance. The bald and conclusory assertions of Muhammad's co-defendants that they possessed potentially exculpatory evidence did not provide adequate grounds for pretrial severance in this multi-defendant trial. The trial court did not abuse its discretion in refusing to grant Muhammad's motion for severance.[4]
 
 
 14
 The fact that two co-defendants chose to testify on Muhammad's behalf at trial serves to vitiate any claim of prejudice on his part as well as to highlight the purely speculative nature of the basis on which the trial court was asked to grant a severance. Despite their pretrial posture, that they would only exonerate Muhammad if they could do so without waiving their Fifth Amendment rights, Jardan and Jackson, the central figure in this case, offered allegedly exculpatory evidence for Muhammad at trial. Hudson and Mims chose not to so testify, and prior to trial the court was offered no reason to believe that they would testify in the event of separate trials, for a grant of separate trials would not necessarily have allowed Mims and Hudson to testify for Muhammad without foregoing their Fifth Amendment rights. United States v. Carella, supra at 731; United States v. Frazier, 394 F.2d 258, 261 (4th Cir. 1968). While it is impossible to ascertain the nature of the evidence that Mims and Hudson[5] might have offered, we note that this is not a case where refusal to sever denied a defendant all potentially exculpatory evidence or the only means of attacking or countering a crucial aspect of the Government's case. Thus, the record does not support a finding that severance was mandated prior to trial or that denial of severance ultimately prejudiced Muhammad at trial.
 
 
 15
 Muhammad, Mims, Jardan and Hudson contend that the overwhelming evidence of Jackson's guilt overflowed prejudicially onto them and resulted in convictions based upon their association with him during the joint trial.[6] The preference for joint trials of defendants jointly indicted, particularly where conspiracy is charged, United States v. Hutchinson, supra at 492, is not limited by any requirement that the quantum of evidence of each defendant's culpability be equal. It is indeed hard to imagine a multiple defendant case in which the evidence against individual defendants is either quantitatively or qualitatively equivalent. A defendant is not entitled to severance merely because the evidence against a co-defendant is more damaging than the evidence against him. United States v. De Larosa, 450 F.2d 1057, 1065 (3d Cir. 1971), cert. denied, 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972). Severance becomes necessary where the proof is such that a jury could not be expected to compartmentalize the evidence as it relates to separate defendants. United States v. De Larosa, supra at 1065.
 
 
 16
 A review of the record does not persuade us that this situation existed in the present case. Jackson was charged with a greater number of substantive offenses than were his co-defendants. Because the Government undertook to establish his complicity by showing his participation in this greater number of offenses, there was necessarily more evidence adduced against Jackson than against his co-defendants. The presentation of more evidence applicable to one defendant than to his co-defendants is simply a fact of life in multiple defendant cases. The greater amount of evidence introduced against Jackson here was not far more damaging than the evidence relating to his co-defendants, but only more from a quantitative standpoint. The quantitative inequality of evidence adduced provides no ground for a severance. Nor does the record support a finding that the evidence presented at trial was of such a nature that the jury could not compartmentalize it to the particular defendant or defendants to whom it was applicable. The cases cited by defendants in support of this contention are largely inapposite, for they involve the peculiar circumstance, not present here, where evidence at a joint trial shows that two or more groups of individuals have participated in a number of separate and distinct conspiracies. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. Butler, 494 F.2d 1246 (10th Cir. 1974); United States v. Varelli, 407 F.2d 735 (7th Cir. 1969).
 
 
 17
 The Government's method of presenting its evidence, discussed below, served to carefully delineate separate events and occurrences and thus to protect against confusion by the jury as to the applicability of any given evidence to a particular defendant. Each defendant was represented by his own counsel. The limited applicability of evidence adduced to individual defendants was clearly explained to the jury during the progress of the trial. Moreover, a review of the jury instructions shows that the jury was carefully instructed in a manner that protected defendants from any improper overflow of evidence from one to another and there is nothing in the record indicating that the jury was confused or failed to follow the court's instructions.
 
 
 18
 Jackson, Jardan, Mims and Hudson contend that they were prejudiced by the security measures in effect during the trial which, they argue, would have been unnecessary had their motions for severance been granted. It is their allegation that the jury was constantly exposed to "extraordinary security measures" throughout the trial and that this exposure created in the jury a misimpression that defendants were dangerous individuals. Defendants rely upon the principle that the fundamental presumption of innocence may be weakened when a criminal defendant is not clothed with the physical indicia of innocence at trial. Kennedy v. Cardwell, 487 F.2d 101 (6th Cir. 1973), cert. denied, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). Thus, where, as here, maximum security measures are taken during a particular trial, it may be necessary to determine whether these measures denied defendants the right to a fair trial by depriving them of the physical indicia of innocence.
 
 
 19
 The security measures utilized at trial included the presence of five plain clothes United States Marshals in the courtroom, the posting of several Marshals outside the front doors of the courtroom and the use of an electronic metal detecting device on all spectators entering the courtroom.[7] We note initially that under the circumstances of this case, where three of five defendants were incarcerated during trial, several Government witnesses were in state or federal custody and a large number of spectators were constantly in attendance, these measures were neither undue, United States v. Howell, 514 F.2d 710, 715 (5th Cir.), cert. denied, 423 U.S. 914, 96 S.Ct. 220, 46 L.Ed.2d 143 (1975), nor beyond the sound discretion of the trial court. Gregory v. United States, 365 F.2d 203, 205 (8th Cir. 1966), cert. denied, 385 U.S. 1029, 87 S.Ct. 759, 17 L.Ed.2d 676 (1967). Furthermore, a review of the record shows the crux of defendants' contention, that the jury was constantly exposed to these measures, to be unfounded. To the contrary, it is clear that the jury was carefully shielded from contact with or awareness of the security measures in effect during the course of the trial. Aside from the security measures to which all veniremen were exposed when they arrived at the courthouse on December 1, 1975, the jury was not exposed to any security measures other than those normally utilized in a case where the jury is sequestered.[8] Thus, not only were the security measures utilized here appropriate under the circumstances and well within the discretion of the trial court, Gregory v. United States, supra, at 205, but they were implemented in a manner which did not deprive defendants of the physical indicia of innocence to which they were entitled.[9]
 
 
 20
 Mims, Jardan, Jackson and Hudson contend that they should have been granted separate trials because of the prejudice they suffered in the eyes of the largely Christian jury as a result of the introduction into evidence by Muhammad of a videotape critical of Christians. A major part of Muhammad's defense consisted of evidence of his public opposition, as a religious leader, to the use of narcotics. As part of this evidence, videotaped excerpts of five of Muhammad's sermons were played for the jury. Prior to their introduction, Muhammad's counsel advised the court that the tapes in question related to Muhammad's position on narcotics and a witness who had chosen the tapes testified that this was their subject matter.
 
 
 21
 On the fifth tape played, Muhammad denounced Christians as sinners and hypocrites. At the conclusion of this tape, counsel for Mims moved for a mistrial on the grounds that the content of the tape had offended the jury, composed mostly of Christians, and thus prejudiced his client. The trial court immediately charged the jury that the last tape was irrelevant to any issue in the case and instructed that it be disregarded. After a short recess, the court again instructed the jury to disregard the last tape, stating that the tape had been offered by Muhammad alone "and not by anyone else."
 
 
 22
 The playing of this videotape interjected a brief but unfortunate interlude of irrelevance into the trial. We note, as did the trial court, that there was no reference in the anti-Christian tape to Muhammad's co-defendants or any indication that they personally endorsed the views expressed in the sermon. We are convinced that the trial court's immediate and firm curative instructions served to prevent any prejudicial effect on Muhammad's co-defendants.[10]
 
 
 23
 Mims, Jardan and Hudson moved for continuances on December 1, 1975, the date set for the commencement of trial. Muhammad and Jackson, who were satisfied with the trial date, did not join in the motion. Mims, Jardan and Hudson contend that the defendants' disparate positions on the desirability of a continuance mandated severances. We find this contention to be lacking in merit. A motion for a continuance is addressed to the sound discretion of the trial court. United States v. Webb, 533 F.2d 391, 395 (8th Cir. 1976); Kansas City Star Co. v. United States, 240 F.2d 643, 651 (8th Cir.), cert. denied, 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957). A review of the record shows that the trial court did not abuse its discretion in denying the motion for continuance.
 
 
 24
 All defendants contend that the manner in which the testimony of Special Agent Vaughan was elicited at trial prejudiced them to a degree requiring reversal.[11] Agent Vaughan was a key Government witness, who was personally involved in many of the narcotic sales at issue. Rather than placing Agent Vaughan on the witness stand only once, the Government proposed to the trial court a presentation of Agent Vaughan's testimony whereby he would be recalled from time to time in order to testify about individual transactions in chronological order. Despite defendants' objections, the trial court agreed to permit Agent Vaughan to be recalled a number of times to testify chronologically. A special system of cross-examination was devised by the trial court to insure that the defendants' rights under the Sixth Amendment would not be diminished in any way by this somewhat novel presentation of evidence. After each appearance, Agent Vaughan was subject to cross-examination on the subject matter of that appearance as well as to cross-examination on the issue of credibility. On his final appearance, Agent Vaughan was subject to full cross-examination covering all his trial testimony. Thus, the chronological presentation of Agent Vaughan's testimony provided each defendant with numerous opportunities for cross-examination as to both credibility and the subject matter of his testimony.
 
 
 25
 The mode and order of interrogation and presentation of evidence are matters placed within the discretion of the trial court. Brinlee v. United States, 496 F.2d 351, 355 (8th Cir.), cert. denied, 419 U.S. 878, 95 S.Ct. 142, 42 L.Ed.2d 118 (1974); Fed.R.Evid. 611(a). A review of the record shows that the manner in which Agent Vaughan was called to testify lent a praiseworthy degree of order to this complicated trial. Clearly, a desire for the orderly presentation of evidence does not outweigh a defendant's right to a fair trial. We find nothing in the record to indicate, however, that the chronological presentation of Agent Vaughan's testimony diminished defendants' rights to cross-examination or prejudiced their rights to a fair trial in any way. The trial court carefully exercised its discretion in managing the presentation of Vaughan's testimony in such a way as to fully protect defendants' rights.[12] There was no abuse of discretion in permitting the Government to present its evidence chronologically through the repeated recall of Agent Vaughan as a witness. In fact, this procedure is commended as one way to clearly present an organized factual recital in an extended conspiracy trial.
 
 
 26
 Hudson, Jardan and Mims contend that severance should have been granted because of the prejudice they suffered as a result of heated colloquy between counsel for Muhammad and Jackson and the prosecutor. The record does reveal a certain, not uncommon, amount of professional enmity between counsel for Muhammad and Jackson and Government counsel. The purportedly prejudicial colloquy cited by defendants as grounds for severance did not occur within the hearing of the jury, however, for in its management of the trial the court required that objections be made at the bench and out of the hearing of the jury. The court was indeed so careful to protect the jury from exposure to colloquy between counsel that the jury was excused for a brief recess during an objection by Government counsel to defense cross-examination of Agent Vaughan. Contrary to defendants' contentions, the jury was not exposed to heated colloquy between Muhammad's and Jackson's counsel and the prosecutor. The jury's mere observation of various defense counsel approaching the bench from time to time in order to voice objections can hardly be deemed equivalent to the jury's exposure to colloquy between counsel prejudicial to co-defendants. Accordingly, severance was not mandated on this basis.
 
 
 27
 Hudson raises two severance contentions in which he is not joined by other defendants. First, Hudson contends that part of Muhammad's cross-examination of Agent Vaughan prejudiced him and required severance. We have carefully reviewed the cross-examination which Hudson now challenges. It consists of a very brief series of questions relating to surveillance of Hudson's arrival in El Paso. Agent Vaughan did not purport to answer these questions on the basis of first-hand knowledge. He specifically qualified his responses in terms of what he "imagined" had happened in El Paso. Moreover, his responses were consistent with previous testimony from other witnesses and did not conflict in any way with Hudson's defense, which contained no denial of the trip to El Paso. Thus, we find the cross-examination challenged by Hudson to have had no prejudicial effect upon him.
 
 
 28
 Secondly, Hudson contends that even if the individual reasons he cites for severance are insufficient, they cumulate to a level of prejudice that mandates severance. The cases Hudson relies upon in support of this contention stand simply for the principle that a trial judge has a continuing duty to grant severance if prejudice appears. The close scrutiny which we have directed to the record in this case in weighing the myriad severance contentions of Hudson and his co-defendants convinces us that the trial court admirably exercised its continuing duty to prevent prejudice to individual defendants as a result of the joint trial and that prejudice requiring severance did not materialize at trial. Thus, the court did not abuse its discretion in refusing to grant severance on the basis of any of the individual grounds advanced by defendants or on the basis of the combined effect of these grounds.
 
 III
 
 29
 Hudson, Mims and Muhammad attack the sufficiency of the evidence supporting their convictions. Certain well known principles apply to the appellate review of the sufficiency of evidence underlying jury verdicts of guilty. It is our duty to view the evidence in the light most favorable to the verdict rendered. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). We must accept as established all reasonable inferences from the evidence that tend to support the jury's verdict. United States v. Overshon, 494 F.2d 894 (8th Cir.), cert. denied, 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974). It is the general rule that the evidence need not " exclude every reasonable hypothesis except that of guilt, but simply that it be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty." United States v. Shahane, 517 F.2d 1173, 1177 (8th Cir.), cert. denied, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975). Furthermore, since circumstantial evidence is intrinsically as probative as direct evidence, Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954), this standard also applies where a conviction rests entirely on circumstantial evidence. United States v. Carlson, 547 F.2d 1346 at 1360 (8th Cir. 1976). Relying upon these familiar principles, we will now address defendants' attacks upon the sufficiency of the evidence supporting their convictions.
 
 
 30
 The threshold question is whether the existence of a conspiracy was established. "The offense of conspiracy consists of an agreement between the conspirators to effect the object of the conspiracy." United States v. Skillman, 442 F.2d 542, 547 (8th Cir.), cert. denied, 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971). The agreement need not be express or formal. It may be established by circumstantial evidence. United States v. Hutchinson, supra at 490; Koolish v. United States, 340 F.2d 513, 523-24 (8th Cir.), cert. denied, 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965). A review of the record here reveals abundant evidence from which the jury could find the existence of a conspiracy to distribute heroin and cocaine. The facts of this case have already been recited and need not be repeated in detail here. It will suffice to say that the testimony of Agent Vaughan, Juan Pablo Garcia and Anderson Jackson and the evidence derived from extensive surveillance and from court-authorized wiretaps was more than sufficient to establish the nature and existence of a well organized and adroitly conducted conspiracy to distribute heroin and cocaine.
 
 
 31
 Hudson, who was charged only with conspiracy, contends that evidence of his involvement therein was legally insufficient. The principal evidence probative of his participation in the conspiracy was established by the testimony of Juan Pablo Garcia, a co-defendant who had pled guilty prior to trial. After the partial credit transaction between Garcia and Jardan for one kilogram of heroin went sour, Garcia demanded the return of the narcotics. Jardan informed Garcia that the heroin would be returned to him in El Paso, Texas, by a man with a missing finger.[13] Following this telephone conversation, Hudson took a commercial flight to El Paso. Upon his arrival at Garcia's motel room in El Paso, Garcia asked Hudson "if he had the stuff with him." Hudson replied affirmatively, removed a package containing heroin from his suitcase and handed it to Garcia. Garcia immediately perceived that the package did not contain the original full kilogram of heroin and confronted Hudson with the obvious shortage: "You know, you're short with this. This is not the whole kilo." Hudson replied: "Well, I don't know anything about it. They just gave me this to give back to you." Hudson then offered to call Jardan in Kansas City in order to find out what was going on. He made a telephone call during which first he and then Garcia talked to Jardan. Garcia expressed his anger at the "rip off" to Jardan, who denied any shortage. Upon Garcia's announcement that he was going to leave, Hudson asked for the money. Garcia responded that he could not give the money back as a result of the shortage. Garcia then left with the narcotics and Hudson subsequently returned to Kansas City.
 
 
 32
 Hudson does not deny his participation in the return of the heroin to Garcia in El Paso. He contends, however, that he did not know that the package he carried in his role as courier contained narcotics and that consequently the requisite element of his knowledge of the conspiracy was not established.[14] In support of this contention, he cites his response of "I don't know anything about it" to Garcia's allegation that the kilo of heroin was short. The jury could have reasonably inferred that this disclaimer applied to knowledge of the shortage, which was the topic of their conversation, and not to the identity of the substance that was delivered by Hudson. Hudson had not, after all, disclaimed knowledge when he responded affirmatively to Garcia's initial inquiry as to whether he had "the stuff", a commonly used name for heroin. Also, Hudson's instruction to recover the $7,000 partial payment for the drugs, coupled with all the circumstances surrounding his trip to El Paso, conveyed knowledge of illicit activity. Knowledge may be inferred by the jury from the circumstances, acts and conduct of the parties. Jacobs v. United States, 395 F.2d 469, 472 (8th Cir. 1968). There was sufficient evidence establishing Hudson's knowing role as a courier of narcotics to convince the jury beyond a reasonable doubt that he was guilty of participating in a conspiracy to distribute heroin.
 
 
 33
 Mims was convicted of participation in the conspiracy to distribute narcotics and of two substantive counts of distribution of heroin. The Government's case against Mims, which consisted mainly of circumstantial evidence, was derived from testimony of a co-conspirator, Juan Pablo Garcia, surveillance by Government agents and interception of certain of Mims' telephone conversations by means of court-authorized wiretaps. It is axiomatic that a conviction for conspiracy may be supported by purely circumstantial evidence. In fact, this court has long recognized that "(a) conspiracy is rarely susceptible of proof by direct evidence. It may be adduced from the conduct of the parties and the attending circumstances." Rizzo v. United States, 304 F.2d 810, 825 (8th Cir.), cert. denied, 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1962); Goode v. United States, 58 F.2d 105, 107 (8th Cir. 1932). Similarly, because circumstantial evidence is intrinsically as probative as direct evidence, Holland v. United States, supra, it may clearly be the sole basis for convictions for substantive offenses. See, e.g., United States v. Diggs, 527 F.2d 509, 512 (8th Cir. 1975). While Mims does not contest these well-settled principles, his attack on the sufficiency of the evidence nevertheless consists of little more than an attempt to belittle the largely circumstantial nature of the Government's case.
 
 
 34
 The circumstantial evidence against Mims was, however, substantial and the jury could reasonably have concluded that Mims participated in two substantive distributions of heroin which furthered the criminal conspiracy charged. Insofar as Count VIII, the illegal distribution of 28 grams of heroin by Mims and Jackson on May 13, 1975, is concerned, the record reveals the following salient evidence of Mims' complicity. On May 9, 1975, a telephone conversation between Jackson and Mims was intercepted in which Jackson informed Mims that he had dropped off some suits[15] which "they liked". On May 13, Agent Vaughan arranged to buy one ounce of heroin from Jackson. Approximately fifteen minutes after this purchase was set up, Jackson called Mims and stated that he wanted the "same suit all the way up", which Mims agreed to deliver immediately. Surveillance revealed that Mims then drove to Jackson's home, and that shortly thereafter Jackson went from his home to Agent Vaughan's apartment and sold him one ounce of heroin. The jury could reasonably infer that Mims was instrumental in this distribution of heroin to Agent Vaughan on May 13.
 
 
 35
 Count X involves the distribution of 138 grams of heroin by Mims and Jackson on June 5, 1975. The evidence adduced showed that Jackson agreed to sell Agent Vaughan seven ounces of heroin on that date. After telling Vaughan that he was still in the process of putting things together, Jackson met with Mims and Muhammad at Muhammad's residence. Mims and Jackson proceeded to drive each other's cars from Muhammad's residence to a motel parking lot, where they talked and then switched cars. Shortly after this meeting and car exchange, Jackson delivered five of the seven ounces of heroin agreed upon to Agent Vaughan. He promised to return with the remaining two ounces as quickly as possible. Jackson then returned to the motel parking lot and met Mims again. After a conversation and another exchange of cars with Mims, Jackson drove Mims' car to the residence of Muhammad. Mims and Jackson then returned to the motel parking lot for another rendezvous and car exchange. Immediately thereafter Jackson delivered the remaining two ounces of heroin to Agent Vaughan. He then returned directly to the motel parking lot where he again spoke with Mims. We believe that as to Count X, the jury could reasonably have concluded that Mims participated in the distribution of seven ounces of heroin to Agent Vaughan on June 5, 1975. The evidence in this case, although circumstantial, is sufficient to have convinced the jury beyond a reasonable doubt that Mims was guilty not only of Counts VIII and X but also of the conspiracy to distribute narcotics for which these substantive offenses served as overt acts. In addition, there is direct evidence of Mims' participation in the conspiracy. Garcia testified that Mims was present when he and Jardan negotiated the deal in El Paso for the purchase of one kilogram of heroin.
 
 
 36
 Muhammad was convicted of engaging in the conspiracy to distribute narcotics and of two substantive counts of distribution of heroin. Count X charged Muhammad, Jackson and Mims with the distribution of seven ounces of heroin to Agent Vaughan on June 5, 1975. Some details of this transaction have been set forth above in connection with Mims' attack on the sufficiency of the evidence. Insofar as Muhammad is concerned, the Government's evidence established that after Jackson had agreed to sell Vaughan seven ounces of heroin on June 5 and had described himself to Vaughan as "still putting things together", he met with Muhammad and Mims at the residence of Muhammad. Jackson then delivered only five of the seven ounces of heroin due Agent Vaughan, agreeing to return with the remainder as quickly as possible. Jackson drove to Muhammad's residence shortly after leaving Agent Vaughan's apartment and subsequently delivered the remaining two ounces to Agent Vaughan. Upon completion of the sale, Jackson returned to Muhammad's residence. Based on this evidence, the jury could reasonably infer that Muhammad was instrumental in this distribution of heroin to Agent Vaughan on June 5, 1975.
 
 
 37
 Count XV charged Muhammad and Jackson with the distribution of thirteen grams of heroin on July 23, 1975. At approximately 9:00 a.m. on July 23, Agent Vaughan and Jackson arranged to meet later in the day to consummate a sale of heroin. Surveillance revealed that at about 9:45 a.m., Muhammad drove his car in front of Jackson's residence, sounded the horn and then drove on. Several hours later Muhammad returned to and entered Jackson's residence, where he stayed for a short period of time. After Muhammad's departure, Jackson went from his residence to Agent Vaughan's apartment and there sold him approximately fourteen grams of heroin for $1,600. Jackson drove directly to Muhammad's residence after the sale and conferred with Muhammad for a few minutes. Muhammad was arrested shortly after this meeting with Jackson. The serial numbers of each of the bills used by Agent Vaughan to pay Jackson for the fourteen grams of heroin had been pre-recorded. A search of Muhammad's person following his arrest produced $1,000 in pre-recorded bills. The other $600 from the sale was found on Jackson. The $1,000/$600 split of the proceeds between Muhammad and Jackson approximated the 60/40 supplier-seller split, discussed below, used by James Jackson when his brother sold narcotics for him, except that in this instance Muhammad received the 60% supplier's share. From the basis of circumstantial and direct evidence presented, the jury could reasonably infer that Muhammad participated in the July 23, 1975, sale of heroin to Agent Vaughan.[16]
 
 
 38
 The jury was presented with sufficient evidence to have convinced it beyond a reasonable doubt that Muhammad was guilty of these two substantive narcotics offenses, which were also overt acts in furtherance of the conspiracy to distribute narcotics. The Government's evidence of Muhammad's participation in the conspiracy was not limited to proof of these two acts, however. There was also abundant evidence of frequent contacts between Muhammad and Jackson during negotiations by Jackson for sales of narcotics and preceding and following these sales. The details of these contacts, which were not limited to June 5 and July 23, have been set forth previously and need not be repeated here. Finally, a co-conspirator's statement implicating Muhammad in the conspiracy was introduced into evidence by the Government. Anderson Jackson, the brother of defendant James Jackson, testified that James, for whom he was distributing heroin, had told him that Muhammad was involved in selling drugs.
 
 
 39
 The rule is well established that a statement by a co-conspirator made during the course and in furtherance of a conspiracy is not hearsay and may be admitted against the declarant and his co-conspirators so long as a conspiracy is established by independent evidence. United States v. Kelley, 526 F.2d 615, 618 (8th Cir. 1975), cert. denied, 424 U.S. 971, 96 S.Ct. 1471, 47 L.Ed.2d 739 (1976); United States v. Frol, 518 F.2d 1134, 1136 (8th Cir. 1975). There is no requirement that the independent evidence of conspiracy be introduced prior to the introduction of the co-conspirator's statement. The order of proof is a matter left to the discretion of the trial court. United States v. Kelley, supra; Brinlee v. United States, 496 F.2d 351, 354 (8th Cir.), cert. denied, 419 U.S. 878, 95 S.Ct. 142, 42 L.Ed.2d 118 (1974). Accordingly, the co-conspirator's statement may be conditionally admitted subject to being "connected up" subsequently by independent proof of conspiracy, which may be totally circumstantial. United States v. Sanders, 463 F.2d 1086, 1088 (8th Cir. 1972). This was the manner in which James Jackson's statement about Muhammad's involvement in the sale of narcotics was admitted.
 
 
 40
 The record in the present case is replete with independent proof of a conspiracy sufficient to "connect up" James Jackson's statement as to Muhammad's involvement in narcotics transactions. Moreover, prior to Anderson Jackson's testimony, the trial court instructed the jury with extreme care and at considerable length that a conspirator's statement could be considered against his co-defendants only if their participation in the conspiracy was established by independent evidence. A similar instruction was repeated at the close of the trial. Thus, we find no error in the manner in which Anderson Jackson's testimony was admitted.
 
 
 41
 Not every extra-judicial statement by a conspirator is admissible against his co-conspirators, however, no matter how abundant the independent evidence of a conspiracy. In addition, under the Federal Rules of Evidence, the statement must have been made during the course of the conspiracy and in furtherance thereof. Fed.R.Evid. 801(d)(2)(E). There is not general agreement as to the wisdom of the "in furtherance" requirement. The drafters of the Model Code of Evidence eliminated this requirement. Model Code of Evidence Rule 508 (1942). Following strenuous debate, it was retained by Congress in the Federal Rules of Evidence.[17] The fact that the federal courts have not applied the "in furtherance" requirement uniformly reflects the long-standing divergence of opinion over the validity of this requirement. Interpretations range from its strict application, see United States v. Birnbaum, 337 F.2d 490 (2d Cir. 1964), to its reduction to a concept of relevancy, see International Indemnity Co. v. Lehman, 28 F.2d 1 (7th Cir.), cert. denied,278 U.S. 648, 49 S.Ct. 83, 73 L.Ed. 561 (1928). The approach in this circuit has been to retain the "in furtherance" requirement, while acknowledging a tendency on the part of commentators to construe this provision broadly. United States v. Harris, 546 F.2d 234 (8th Cir. 1976); United States v. Rich,518 F.2d 980 (8th Cir. 1975), cert. denied, 427 U.S. 907, 96 S.Ct. 3193, 49 L.Ed.2d 1200 (1976); United States v. Overshon, 494 F.2d 894, 899 (8th Cir.), cert. denied, 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974).
 
 
 42
 We must, therefore, determine whether the statement of James Jackson introduced into evidence through the testimony of Anderson Jackson was "in furtherance" of the conspiracy to distribute narcotics. Anderson testified that in December, 1974, he had begun to sell narcotics supplied to him by his brother James, who took 60% of the proceeds and left 40% for Anderson. In February, 1975, Anderson was arrested for a non-narcotics offense and incarcerated for a few days. Upon his release, he renewed his narcotics selling activities. In early March, Anderson entered a hospital in order to receive treatment for his narcotics habit. He recommenced using and selling narcotics shortly after his release. In mid-March, 1975, Anderson was again incarcerated for a non-narcotics offense. He remained in jail for approximately two weeks. It was during a visit with Anderson shortly after his release from jail that James made the statement implicating Muhammad in the narcotics conspiracy. Anderson testified that:
 
 
 43
 (James) told me he got demoted from captain in the Muslims because he was selling drugs and that Nathaniel Muhammad was involved in selling drugs; that he demoted him from captain where it would look good for the Muslims in case something came down.
 
 
 44
 It is reasonable to conclude that this statement was made in an effort by James to again enlist Anderson as a seller of narcotics for the conspiracy. Anderson had previously returned to this occupation following release from each incarceration or institutionalization. Thus, after a longer than usual stay in jail, it would be reasonable for James to want to assure Anderson's continued participation in the conspiracy and to apprise him of developments that Anderson might be unaware of because of his incarceration Cf. United States v. Overshon, supra. Thus, although it is a close question, we believe that James Jackson's statement to Anderson concerning Muhammad's involvement in the sale of narcotics was in furtherance of the conspiracy. Since it was clearly made in the course of the conspiracy and was "connected up" by sufficient independent evidence of conspiracy, this statement was properly admitted under Rule 801(d)(2)(E). We conclude that the Government's evidence was sufficient to have convinced the jury beyond a reasonable doubt that Muhammad was guilty of conspiring to distribute narcotics and of participating in two sales of heroin.
 
 IV
 
 45
 The Government introduced into evidence eleven taped conversations intercepted pursuant to three court orders authorizing the interception of wire communications. All defendants moved unsuccessfully to suppress the introduction of these conversations into evidence. On appeal, however, only Hudson and Jardan have asserted error in the trial court's denial of their motions to suppress. They challenge the legality of the wiretaps on two grounds. First, Jardan contends that pursuant to 18 U.S.C. § 2518(1)(b)(iv) (1970) and 18 U.S.C. § 2518(4)(a) (1970) he should have been named as a party whose communications would be intercepted by the wiretaps authorized on May 9, 1975, and May 29, 1975. Hudson makes an identical contention as to the wiretap authorized on June 24, 1975. Secondly, both Jardan and Hudson contend that the wiretaps were improper under 18 U.S.C. § 2518(3)(c) (1970) because normal investigative techniques would have sufficed under the circumstances of this case.
 
 Naming requirements
 
 46
 18 U.S.C. § 2518(1)(b)(iv) requires that an application for an order authorizing the interception of a wire communication include "the identity of the person, if known, committing the offense and whose communications are to be intercepted." Section 2518(4)(a) requires that the order of authorization specify "the identity of the person, if known, whose communications are to be intercepted." Jardan challenges WT-1975-1, May 9, 1975, and WT-1975-2, May 29, 1975, on the grounds that he was not named in the applications or authorization orders as a person whose communications were to be intercepted, despite the fact that at the time of the applications the Government allegedly had knowledge of him which required his identification under §§ 2518(1)(b)(iv) and 2518(4)(a).
 
 
 47
 The May 9, 1975, application for WT-1975-1, a tap on the telephone of James Jackson, sought authorization to intercept communications of Jackson, Muhammad and "others as yet unknown" concerning various narcotics offenses. Jardan's name was not mentioned in the application or in the order authorizing WT-1975-1. The May 29, 1975, application for WT-1975-2 a tap on the telephone of Spencer Mims, sought authorization to intercept communications of Mims, Jackson and "others as yet unknown" concerning various narcotics offenses. Jardan was not identified as a person whose communications were to be intercepted. The application did state, however, as did the order authorizing the wiretap, that there was probable cause to believe that Mims, Jackson, Muhammad and Jardan, inter alia, were involved in committing narcotics offenses. Conversations by Jardan were intercepted pursuant to both wiretaps.
 
 
 48
 Hudson's contention involves a third wiretap not challenged by Jardan, WT-1975-3. The June 24, 1975, application for WT-1975-3 taps on the telephones of Spencer Mims and Lushrie Jardan, sought authorization to intercept communications of Muhammad, Mims, Jardan, Jackson and "others as yet unknown" concerning various narcotics offenses. Hudson was not identified as a person whose communications were to be intercepted. The application, as well as the order authorizing the wiretap, did state, however, that there was probably cause to believe that Mims, Jackson, Muhammad, Jardan and Hudson, inter alia, were involved in the commission of narcotics offenses. Conversations of Hudson were intercepted on WT-1975-3.
 
 
 49
 Jardan and Hudson contend that the Government had probable cause to name them in its applications pursuant to § 2518(1)(b)(iv) as known individuals whose communications were to be intercepted. Accordingly, they argue that they should have been so designated in the wiretap orders under § 2518(4)(a) and that their non-identification in the applications and orders required suppression of the conversations intercepted. We note that since it is only through reference to the Government's applications that the authorizing judge can be expected to learn of the target individuals, the identification requirements of §§ 2518(1)(b)(iv) and 2518(4)(a) have been deemed to be of equal breadth. United States v. Kahn, 415 U.S. 143, 152, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).
 
 
 50
 Section 2518(1)(b)(iv) requires that in a wiretap application, the Government specify "the identity of the person, if known, committing the offense and whose communications are to be intercepted." This provision has been interpreted to require that the Government name an individual in an application if it has probable cause to believe (1) that the individual is engaged in the criminal activity under investigation and (2) that the individual's conversations will be intercepted over the target telephone.[18] United States v. Kahn, supra; see United States v. Donovan, --- U.S. ----, ----, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). This latter requirement applies to persons placing calls to or from the target telephone. United States v. Donovan, supra at ----, 97 S.Ct. 658.
 
 
 51
 Jardan and Hudson each allege that the Government failed to name him under § 2518(1)(b)(iv), although it had probable cause to do so. Even if we assume arguendo that the Government did have probable cause to believe that Hudson and Jardan were engaged in the criminal activity under investigation, we do not believe that the record sustains a finding that there was probable cause to believe that their communications would be intercepted over the target telephone. A close reading of the record reveals that the only knowledge that can fairly be attributed to the Government related to Hudson's and Jardan's mere association with persons under investigation. We find knowledge of mere association insufficient, under the facts of this case, to support the conclusion that the Government had probable cause to believe that Hudson and Jardan would be intercepted over the target telephone.
 
 
 52
 The Government lacked probable cause to believe that Hudson and Jardan were persons "committing the offense and whose communications (would) be intercepted" and did not, therefore, violate § 2518(1)(b)(iv) in omitting Hudson's and Jardan's names from the wiretap applications challenged. Thus, the wiretap orders based on these applications were valid and in conformance with § 2518(4)(a) and the trial court did not err in refusing to suppress the conversations intercepted pursuant to these wiretaps.[19]
 
 
 53
 Utilization of normal investigative techniques
 
 
 54
 18 U.S.C. § 2518(1)(c) requires that an application for an order authorizing the interception of a wire communication include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c) requires that the judge to whom the wiretap application is directed authorize a wiretap only if he determines on the basis of the facts submitted by the applicant that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." Jardan and Hudson both contend that the applications for the wiretaps at issue here were deficient under § 2518(1)(c) and that there was, therefore, an insufficient basis for their authorization under § 2518(3)(c).
 
 
 55
 The Supreme Court has stated that the language of §§ 2518(1)(c) and 2518(3)(c) "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n.12, 94 S.Ct. 977, 983, 39 L.Ed.2d 225 (1974). In enacting Title III, Congress did not require the exhaustion of "specific" or "all possible" investigative techniques before wiretap orders could issue. United States v. Smith, 519 F.2d 516, 518 (9th Cir. 1975). Congress prohibited wiretapping only when normal investigative techniques were likely to succeed and not too dangerous, United States v. Daly, 535 F.2d 434, 438 (8th Cir. 1976), and "(m)erely because a normal investigative technique is theoretically possible, it does not follow that it is likely." S.Rep. No. 90-1097, 90th Cong., 2d Sess., reprinted in (1968) U.S.Code Cong. and Admin.News, p. 2190. Thus, §§ 2518(1)(c) and 2518(3)(c) have been deemed to be designed only to ensure that wiretapping is not "routinely employed as the initial step in criminal investigation." United States v. Giordano, 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).
 
 
 56
 The issue of whether the provisions of §§ 2518(1)(c) and 2518(3)(c) have been complied with must be determined by viewing the facts contained in the Government's sworn applications and supporting affidavits. These applications and affidavits must be tested in a "practical and commonsense fashion." United States v. Brick, 502 F.2d 219, 224 n. 14 (8th Cir. 1974); see United States v. Kirk, 534 F.2d 1262, 1274 (8th Cir. 1976). Moreover, as in other suppression matters, the judge to whom the wiretap application is made is entrusted with broad discretion. United States v. Daly, supra.
 
 
 57
 In the present case, each application for a wiretap was supported by an affidavit of Agent Vaughan, the key investigative figure involved. We have carefully reviewed the applications for WT-1975-1, WT-1975-2 and WT-1975-3 and the affidavits of Agent Vaughan that accompany them. These affidavits establish unequivocally that traditional investigative techniques had been used extensively before authorization for wiretaps was sought. Agent Vaughan's affidavits also detail the reasons why these normal investigative techniques had failed and were likely to continue to fail. Moreover, the affidavits cited specific instances of failures which established that the utilization of normal techniques was not only unlikely to succeed but also likely to create risks of unreasonable danger. We conclude that the applications for the wiretaps at issue here were sufficient under § 2518(1)(c) and that the wiretap authorization orders met the requirement of § 2518(3)(c). Accordingly, the trial court did not err in denying defendants' motions to suppress the communications intercepted pursuant to WT-1975-1, WT-1975-2 and WT-1975-3.
 
 
 58
 Judgment affirmed.
 
 
 
 [1]
 We note, because defendants make constant reference to the fact in their briefs, that all defendants except Garcia are members of the Nation of Islam, commonly known as the Black Muslim faith. Muhammad serves as the local leader of this faith in the Kansas City area. Jackson was, at least prior to his arrest, a Captain of Security for the Temple of Islam. Mims was one of Muhammad's assistant ministers and a Supervising Captain in the Black Muslim hierarchy. Hudson and Jardan subscribe to the Black Muslim faith, but apparently did not figure in the upper echelons of the religious organization prior to their arrests
 
 
 [2]
 Count II of the indictment charged Jackson with the alleged distribution of cocaine to a person under twenty-one years of age in violation of 21 U.S.C. §§ 841(a)(1) and 845. That count was not submitted to the jury, however, and was dismissed by the trial court, the Honorable Elmo B. Hunter, United States District Judge for the Western District of Missouri
 
 
 [3]
 In the designation of issues on appeal, defendants also challenge the validity of jury selection. They contend that the Government's striking of several blacks from the jury panel was part of a systematic practice by the Government to strike blacks from juries in the Western District of Missouri. An identical contention was raised in United States v. Carter, 528 F.2d 844, 848 (8th Cir. 1975), cert. denied, 425 U.S. 961, 96 S.Ct. 1745, 48 L.Ed.2d 206 (1976), concerning the Government's use of jury strikes in the Western District of Missouri in 1974. The court in Carter found that the defendant had failed to establish that the Government's use of jury strikes in the Western District of Missouri in 1974 constituted an impermissible practice under Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed. 759 (1965). In the instant case, a post-trial hearing was held on this issue. The trial court determined that the evidence there presented failed to show any systematic practice on the Government's part of striking blacks from jury panels in the Western District of Missouri in 1973, 1974 or 1975. The court further found that there was no systematic or arbitrary striking of blacks from the jury panel from which the jury in this case was selected. Nothing defendants have presented on appeal convinces us that the trial court's resolution of this issue did not rest on a firm factual and legal basis
 
 
 [4]
 We note that where an appropriate record concerning the exculpatory evidence that would be available from a co-defendant in the event of separate trials has been offered, some courts have isolated certain circumstances under which severance is deemed obligatory. United States v. Sica, 20 Crim.L.Rep. (BNA) 2170 (3d Cir. Oct. 20, 1976); United States v. Martinez, 486 F.2d 15 (5th Cir. 1973); United States v. Shuford, 454 F.2d 772 (4th Cir. 1971); Byrd v. Wainwright, 428 F.2d 1017 (5th Cir. 1970); United States v. Echeles, 352 F.2d 892 (7th Cir. 1965). Where, as here, the record has simply shown an unsupported contention that severance could result in exculpatory testimony of a co-defendant, courts have consistently declined to grant severance. United States v. Evans, 526 F.2d 701 (5th Cir.), cert. denied, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976); United States v. Ellsworth, 481 F.2d 864 (9th Cir.), cert. denied, 414 U.S. 1041, 94 S.Ct. 544, 38 L.Ed.2d 332 (1973); United States v. Nakaladski, 481 F.2d 289 (5th Cir.), cert. denied, 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (1973); United States v. Kilgore, 403 F.2d 627 (4th Cir. 1968), cert. denied, 394 U.S. 932, 89 S.Ct. 1204, 22 L.Ed.2d 462 (1969); United States v. Kahn, 381 F.2d 824 (7th Cir.), cert. denied, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967); United States v. Kahn, 366 F.2d 259 (2d Cir.), cert. denied, 385 U.S. 948, 87 S.Ct. 324, 17 L.Ed.2d 226 (1966); United States v. Fluellen, 396 F.Supp. 1168 (E.D.Pa.1975), aff'd, 530 F.2d 965 (3rd Cir. 1976)
 
 
 [5]
 The value of any allegedly exculpatory evidence that Hudson could have offered is questionable in light of the fact that the Government's evidence did not connect Hudson directly to Muhammad in the criminal scheme
 
 
 [6]
 In conjunction with this contention, defendants make the bare and unsupported allegation that severance was necessary because of their reliance on inconsistent defenses. In order to demonstrate an abuse of discretion, defendants must show more than the fact that co-defendants whose strategies were generally antagonistic were tried together. United States v. Robinson, 139 U.S.App.D.C. 286, 432 F.2d 1348 (1970). All that the defendants here have shown is that each defendant relied on general denial, except for Jackson, who claimed entrapment. The reliance of only one of several co-defendants on an entrapment defense does not establish a right to a severance. United States v. Eastwood, 489 F.2d 818 (5th Cir. 1973). The trial court did not abuse its discretion in refusing to sever on the basis of inconsistent defenses
 
 
 [7]
 These measures were undertaken pursuant to a general order of the District Court en banc filed on July 30, 1975, which required maximum security in any case that was likely to be widely publicized and thus attended by many persons and curiosity seekers, some of whom might be inclined to cause disruption
 
 
 [8]
 The jurors entered and left both the courthouse and courtroom through back entrances, thus avoiding contact with the security measures in effect at the entrances to the building and courtroom. The United States Marshals in the courtroom were nonuniformed
 
 
 [9]
 It was alleged by Jardan for the first time at a post-trial hearing that a woman juror had seen defendants in jail garb and handcuffs in the courthouse parking lot at some point during the course of the trial. Questioning revealed that Jardan was not sure whether the woman was a juror or security person. Moreover, none of Jardan's co-defendants corroborated his allegation and it was not brought to the trial court's attention until after the conclusion of the trial. Assuming arguendo that one member of the jury was exposed to a glimpse of the defendants in jail uniforms and handcuffs and that this incident is now cognizable on appeal, we find that no prejudice has been shown to have resulted. United States v. Leach, 429 F.2d 956, 962 (8th Cir. 1970), cert. denied, 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 151 (1971). Unlike the situation where a defendant is tried in jail garb, Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), far less danger of prejudice inheres in a situation where a juror's vision of a defendant in jail uniform is fleeting and outside the courtroom
 
 
 [10]
 Closely allied to defendants' contentions concerning the anti-Christian videotape are allegations that severance should have been granted because Muhammad's co-defendants were prejudiced by the religious "undertones" of the trial. It appears that defendants base this contention on an assumption, unsupported by any evidence, that the Black Muslim faith is so unpopular that to be associated with it is automatically prejudicial. Even if we assume arguendo that the present trial was pervaded by religious "undertones" and that the Black Muslim faith is unpopular, defendants have failed to show that the trial court abused its discretion in refusing to grant motions for severance on this basis. The unfavorable impression created by a defendant's identification with an unpopular group does not require severance. United States v. De Larosa, 450 F.2d 1057, 1065 (3d Cir. 1971), cert. denied, 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972)
 
 
 [11]
 Hudson and Jardan raise this contention as an aspect of their severance contention. Mims, Muhammad and Jackson do not tie their claim of prejudice on this basis to the severance issue. Whether the matter of Vaughan's testimony is deemed an aspect of trial management or a part of the question of severance, it must by analyzed in terms of its impact on defendants' rights to a fair trial
 
 
 [12]
 The court was attuned to the danger that Agent Vaughan's testimony could become so piecemeal as to confuse rather than clarify matters. Thus, when on one occasion the Government proposed to recall Vaughan several times to establish a single transaction, the court required a consolidation of all his testimony with respect to a given date and count
 
 
 [13]
 At trial, Hudson was required to display his left hand, which has a missing index finger, to the jury. Garcia also identified Hudson at trial as the man who returned the heroin to him in El Paso
 
 
 [14]
 Hudson relies chiefly on United States v. Amato, 495 F.2d 545 (5th Cir.), cert. denied, 419 U.S. 1013, 95 S.Ct. 333, 42 L.Ed.2d 286 (1974) and Miller v. United States, 382 F.2d 583 (9th Cir. 1967), cert. denied, 390 U.S. 984, 88 S.Ct. 1108, 19 L.Ed.2d 1285 (1968), in support of his contention that knowledge of the conspiracy was not established. The holdings in Amato and Miller that knowledge had not been established devolved from findings that there was an insufficient factual basis from which knowledge could be inferred. We find the factual basis in the present case, which shows Hudson to have been a cog in a finely tuned mechanism for the distribution of narcotics, to be sufficient to support the inference that Hudson knowingly participated in the illegal conspiracy
 
 
 [15]
 Agent Vaughan testified that in narcotics deals with Jackson the term "suit" was sometimes used to refer to narcotics. The use of such terminology, often designated a "laundry code", is not unique to this case. See United States v. Manfredi, 488 F.2d 588, 592 (2d Cir. 1973), cert. denied, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974)
 
 
 [16]
 We note that Muhammad offered an exculpatory explanation of his possession of the money as well as of certain other facts underlying the indictment. These explanations raised a question of credibility, the resolution of which rested solely in the province of the jury. Petschl v. United States, 369 F.2d 769, 771 (8th Cir. 1966). The jury was not required to believe Muhammad's story. United States v. Miller, 543 F.2d 1221 (8th Cir. 1976); United States v. Ordones, 469 F.2d 70 (9th Cir. 1972)
 
 
 [17]
 See Hearings on the Proposed Rules of Evidence Before the Special Subcommittee on Reform of Federal Criminal Laws of the House Committee on the Judiciary, 93rd Cong., 1st Sess., House Hearings Supp. at 56, 58, 59 (1973), reported in Am.Jur.2d Federal Rules of Evidence, Appendix 4 at 314, 316, 317 (1975)
 
 
 [18]
 We note that United States v. Donovan, supra, appears to contain two slightly divergent interpretations of the naming requirement of § 2518(1)(b) (iv). The Court initially cites United States v. Kahn, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974) for the proposition that § 2518(1)(b)(iv) requires probable cause to believe that the individual is engaged in the criminal activity under investigation and probable cause to believe that the individual's conversations will be intercepted over the target telephone. United States v. Donovan, supra, --- U.S. at ----, 97 S.Ct. (658) at 668. The Court then holds that a wiretap application must name an individual if the Government "has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone." Assuming that probable cause to believe differs from expectation, we do not believe that the Supreme Court intended to depart from the probable cause standard set forth in United States v. Kahn, supra. This interpretation is supported by the partial dissent of Justices Marshall and Brennan, which states the majority holding to be that an application for a wiretap "must name all individuals whom the Government has probable cause to believe are committing the offense being investigated and will be overheard." United States v. Donovan, supra at ----, 97 S.Ct. at 676
 
 
 [19]
 We note that even had the Government possessed probable cause to believe that Jardan and Hudson were engaged in the criminal activity under investigation and that they would be intercepted on the target telephones, suppression would not be mandated here. There is no suggestion that Government agents knowingly failed to identify Jardan and Hudson in order to keep relevant information from the District Court. Accordingly, because identification in an intercept application of all those likely to be overheard in incriminating conversations does not play a "substantive role" with respect to judicial authorization of intercept orders and thus does not impose a limitation on the use of intercept proceedings, suppression is not warranted under § 2518(10)(a) (i). United States v. Donovan, supra at ---- - ----, 97 S.Ct. 658